# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Twitter, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

PeopleBrowsr, Inc. and PeopleBrowsr Pty., Ltd.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a **written** response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* San Francisco Superior Court<br><br>400 McAllister St.<br>San Francisco, CA 94102 | CASE NUMBER: *(Número del Caso):* **CGC-12-526393** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael Kahn, Crowell & Moring LLP, 275 Battery St., 23rd Floor, SF, CA 94111 415.986.2800

| DATE: **NOV 2 7 2012** CLERK OF THE COURT | Clerk, by MEREDITH GRIER | , Deputy |
|---|---|---|
| *(Fecha)* | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: Twitter, Inc.

   under: ☑ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20,465<br>www.courtinfo.ca.gov |

# EXHIBIT B

1  CROWELL & MORING LLP
   Michael Kahn (CSB No. 57432, mkahn@crowell.com)
2  Gregory D. Call (CSB No. 120483, gcall@crowell.com)
   Beatrice B. Nguyen (CSB No. 172961, bbnguyen@crowell.com)
3  275 Battery Street, 23rd Floor
   San Francisco, CA  94111
4  Telephone: 415.986.2800
   Facsimile: 415.986.2827
5
6  Attorneys for Plaintiffs
   PeopleBrowsr, Pty., Ltd. and PeopleBrowsr, Inc.

7

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

NOV 2 7 2012

CLERK OF THE COURT
BY: _____
MEREDITH GRIER
Deputy Clerk

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SAN FRANCISCO

10

| 11 PEOPLEBROWSR, INC., AND<br>PEOPLEBROWSR PTY., LTD., | Case No. CGC-12-526393 |
|---|---|
| 12 | **COMPLAINT FOR:** |
| 13                 Plaintiff, | **(1) INTENTIONAL INTERFERENCE<br>WITH CONTRACTUAL RELATIONS;** |
| 14         v. | |
| TWITTER, INC., | **(2) INTENTIONAL INTERFERENCE<br>WITH PROSPECTIVE ECONOMIC<br>ADVANTAGE;** |
| 15 | |
| 16                 Defendant. | |
| 17 | **(3) PROMISSORY ESTOPPEL; AND** |
| 18 | **(4) VIOLATIONS OF CAL. BUS. & PROF.<br>CODE §§ 17200 ET SEQ.** |
| 19 | |

20

21

22

23

24

25

26

27

28

1  CROWELL & MORING LLP
   Michael Kahn (CSB No. 57432, mkahn@crowell.com)
2  Gregory D. Call (CSB No. 120483, gcall@crowell.com)
   Beatrice B. Nguyen (CSB No. 172961, bbnguyen@crowell.com)
3  275 Battery Street, 23rd Floor
   San Francisco, CA  94111
4  Telephone: 415.986.2800
   Facsimile: 415.986.2827
5
   Attorneys for Plaintiffs
6  PeopleBrowsr, Pty., Ltd. and PeopleBrowsr, Inc.

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF SAN FRANCISCO

10

11  PEOPLEBROWSR, INC., AND              Case No.
    PEOPLEBROWSR PTY., LTD.,
12                                        **COMPLAINT**
              Plaintiff,
13
         v.
14
    TWITTER, INC.,
15
              Defendant.
16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

PARTIES ............................................................................................................................... 4

VENUE .................................................................................................................................. 4

FACTUAL BACKGROUND ................................................................................................ 4

    A.    Twitter Is the Only Source for Its Unique Brand of Consumer Information .......... 4

    B.    PeopleBrowsr Built a Valuable Business in Reliance on Twitter's
        Commitment to Keep Access to Its Data Open .................................................... 6

        1.    Twitter Promised Open Data Access to Encourage
                Third Parties to Improve Its Service ...................................................... 6

        2.    Twitter Offered the Firehose as Part of Its Open
                Approach .............................................................................................. 10

        3.    Twitter's Open Ecosystem Created Downstream Markets,
                Including PeopleBrowsr's Twitter Big Data Analytics Market ............... 11

        4.    Twitter Has Offered PeopleBrowsr the Firehose for Over
                Four Years as Part of Its Open Platform ................................................ 12

        5.    PeopleBrowsr Provides Valuable Insight Utilizing the
                Full Firehose ........................................................................................ 15

        6.    The Firehose Is Essential to PeopleBrowsr's Business............................ 17

    C.    Twitter Seeks to Destroy PeopleBrowsr's Business In Order to
        Eliminate Competition in Data Analytics Markets .............................................. 20

        1.    Twitter Seeks to Dominate Downstream Twitter Markets
                in Order to Extract Greater Revenues .................................................... 21

        2.    Twitter's Chief Weapon in Restraining Competition Is
                Limiting Access to Data ........................................................................ 22

        3.    PeopleBrowsr's Threatened Termination Follows Twitter's
                Successful Efforts to Take Over Other Downstream Markets.................. 23

        4.    Twitter Now Seeks to Cut Off PeopleBrowsr's Firehose
                Access in Order to Restrain Competition in the Twitter
                Big Data Analytics Market .................................................................... 25

                a.    Twitter Wants to Participate in the Twitter Big
                        Data Analytics Market .............................................................. 27

                b.    Twitter Has Threatened to Cut Off the Firehose in
                        Order to Eliminate PeopleBrowsr as a Competitor...................... 28

    D.    Twitter Has Refused to Provide Any Substantive
        Rationale For Termination .................................................................................. 34

    E.    Twitter's Termination of PeopleBrowsr's Firehose Access Would
        Irreparably Harm PeopleBrowsr And Harm Competition ................................... 36

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

## TABLE OF CONTENTS
(continued)

2
Page

3  CAUSES OF ACTION ................................................................................................ 38

4

5  FIRST CAUSE OF ACTION:  INTENTIONAL INTERFERENCE
       WITH CONTRACTUAL RELATIONS ................................................................. 38

6  SECOND CAUSE OF ACTION:  INTENTIONAL INTERFERENCE
       WITH PROSPECTIVE ECONOMIC ADVANTAGE ........................................... 40

7
   THIRD CAUSE OF ACTION:  PROMISSORY ESTOPPEL ......................................... 42

8
   FOURTH CAUSE OF ACTION:  VIOLATIONS OF BUSINESS
9       AND PROFESSIONS CODE § 17200 ..................................................................... 43

10  PRAYER FOR RELIEF ................................................................................................ 45

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

1    PeopleBrowsr, Inc. and PeopleBrowsr Pty., Ltd. ("PeopleBrowsr") allege upon knowledge

2    as to themselves and their own actions, and upon information and belief as to all other matters,

3    against Defendant Twitter, Inc., as follows:

4                                    **PRELIMINARY STATEMENT**

5         1.      PeopleBrowsr seeks a preliminary and permanent injunction to prevent Twitter

6    from destroying its business, interfering with PeopleBrowsr's contractual and prospective

7    business relations, and restraining competition in markets using Twitter data.

8         2.      Founded in 2006, Twitter is an online communications platform that lets users

9    share information in real time through short messages called "tweets," which have a maximum

10   length of 140 characters. Twitter describes itself as allowing its users to discover and share what

11   is happening right now. The service is free of charge and open to anyone. Twitter has over 140

12   million users, who collectively post an average of 340 million tweets per day.

13        3.      Twitter is the only major platform for real-time, public commentary on users'

14   experiences, providing unique data regarding trends and users' interests. Twitter has sole control

15   over access to its data, which gives it power to control competition in downstream markets

16   utilizing that data, including the "Twitter Big Data Analytics" market in which PeopleBrowsr and

17   others use sophisticated data mining techniques to derive insights from the overwhelming flow of

18   information generated on Twitter.

19        4.      For over four years, PeopleBrowsr has received every single tweet posted on

20   Twitter through what is referred to as the Twitter "Firehose." In exchange, PeopleBrowsr

21   currently pays Twitter over $1 million per year.

22        5.      PeopleBrowsr has built a successful business sorting and analyzing each and every

23   tweet posted on Twitter. By analyzing its 1000-day data mine of tweets, PeopleBrowsr

24   empowers individual web users and organizations to find value in the massive volumes of data

25   produced on Twitter. It also provides organizations deep insight regarding consumers' reactions

26   to products and services as well as the Twitter users who have the most influence in certain

27   locations or communities. This type of information is highly valuable, and PeopleBrowsr has

28   contracts for the development and sale of its products and services with customers including

1   Fortune 500 companies and government entities, such as the Department of Defense. It employs

2   forty people. PeopleBrowsr's platform is already successful and is projected to rapidly increase

3   in value as the Twitter Big Data Analytics market in which it participates grows.

4         6.     PeopleBrowsr's products require the full Firehose feed. A mere sample of Twitter

5   data is insufficient for PeopleBrowsr to provide the products its users expect. Though there are

6   some data analytics companies that can provide certain limited types of Twitter data analysis

7   based on sampling, PeopleBrowsr competes in a separate "Twitter Big Data Analytics" market, in

8   which a few, highly sophisticated players analyze massive amounts of Twitter data to provide

9   deeper insights. PeopleBrowsr was a pioneer in applying "big data" analysis techniques to

10   Twitter data, finding new uses for social data. PeopleBrowsr's products rely on creating a

11   comprehensive picture of Twitter activity based on the Firehose. They need full historical and

12   contextual data to provide timely service, detect often elusive emerging trends, provide

13   meaningful rankings of influential individuals, and provide sophisticated historical analyses. This

14   is only possible with the Firehose. As a result, PeopleBrowsr has communicated to Twitter

15   throughout the companies' relationship that full Firehose access is essential to its business.

16         7.     PeopleBrowsr has invested millions of dollars and years of work in building a

17   business based on the Firehose. It did so in reliance on Twitter's representations that it would

18   maintain an "open ecosystem" for the use of its data, in which PeopleBrowsr could freely

19   compete without fear that Twitter would cut off access to its data in order to influence which

20   businesses succeed or to usurp business opportunities for itself. Twitter described the Firehose as

21   a part of this open ecosystem that it would make available to "everyone in the system." This open

22   approach was a key component of Twitter's business strategy, and a key aspect of Twitter's

23   service that PeopleBrowsr contracted for, encouraging PeopleBrowsr and thousands of other

24   developers to find innovative uses for Twitter data so that Twitter could focus on its core product.

25         8.     When entering into its business relationship with Twitter, PeopleBrowsr

26   reasonably expected that it was buying into an open ecosystem, and that its access to the Firehose

27   would not be cut off to allow Twitter to usurp its business opportunities.

28

1        9.     Now, after years in a mutually beneficial relationship, Twitter has threatened to cut

2   off PeopleBrowsr's access to the Firehose on November 30, 2012.  Twitter knows that this will

3   devastate PeopleBrowsr's business and eliminate it as a competitor in the Twitter Big Data

4   Analytics market, clearing the way for Twitter to dominate that market.  Twitter has repeatedly

5   required PeopleBrowsr to reveal its confidential innovations and business prospects, including

6   existing contracts, so that it could use this information to appropriate PeopleBrowsr's business

7   opportunities.

8        10.    Twitter has no valid business reason for terminating PeopleBrowsr's Firehose

9   access.  PeopleBrowsr has not breached any obligation under its agreement with Twitter for

10   Firehose access, and Twitter has provided no valid business justification for the termination.

11   Though Twitter has made vague allusions to no longer being able to bear the cost of

12   PeopleBrowsr's Firehose access, it enjoys a profitable agreement with PeopleBrowsr under which

13   it currently receives over $1 million per year for that access.  A more likely explanation for its

14   threatened action is its expressed desire to provide Firehose access only to closely controlled

15   partnerships "driven by Twitter," leaving competitors without the data access necessary to

16   compete.

17        11.    Without judicial intervention, PeopleBrowsr will lose access to the Firehose, and

18   its business will be devastated.  Ending PeopleBrowsr's business is an irreparable injury that

19   cannot be compensated by an ordinary damages award.  It would render PeopleBrowsr unable to

20   fulfill its existing long-term multi-million dollar contracts, including its $3 million contract with

21   the Department of Defense.  It would also harm competition in the Twitter Big Data Analytics

22   market.

23        12.    This is precisely Twitter's goal.  Twitter has engaged in a pattern and practice of

24   converting downstream Twitter markets from open ecosystems to tightly controlled markets.  It is

25   now using its control over its data to take over the Twitter Big Data Analytics market.  By

26   denying competitors access to the Firehose and forcing them to obtain data from its partners

27   DataSift and Gnip, who are authorized only to provide a fraction of Twitter's data, Twitter is

28

1  ensuring that it and a few closely controlled partners will be the only providers with sufficient

2  data access to compete.

3      13.    Accordingly, PeopleBrowsr seeks a preliminary and a permanent injunction to

4  enjoin Twitter from unfairly and unreasonably terminating PeopleBrowsr's access to the

5  Firehose.

## PARTIES

7      14.    Plaintiff PeopleBrowsr, Inc. is, and at all relevant times was, a corporation duly

8  organized and existing under the laws of the State of Delaware with its principal offices in San

9  Francisco, California and Sydney, Australia.

10     15.    Plaintiff PeopleBrowsr Pty., Ltd. is and at all relevant times was, a proprietary

11 limited company duly organized and existing under the laws of the Australia with its principal

12 offices in San Francisco, California and Sydney, Australia.

13     16.    Defendant Twitter, Inc. is, and at all relevant times was, a corporation duly

14 organized under the laws of the State of Delaware with its principal place of business in San

15 Francisco, California.

## VENUE

17     17.    All of the actions giving rise to PeopleBrowsr's claims occurred in San Francisco

18 and Twitter's principal place of business is in San Francisco.

19     18.    Venue is proper in the Superior Court of California, County of San Francisco,

20 pursuant to California Civil Procedure Code section 395.5.

## FACTUAL BACKGROUND

**A.      Twitter Is the Only Source for Its Unique Brand of Consumer Information.**

23     19.    Twitter provides a platform for its 140 million users to communicate with other

24 users who "follow" them and with the public at large.  Twitter currently boasts approximately 340

25 million tweets each day.  Twitter views this platform as a utility, like the phone company.  As

26 Jack Dorsey, Twitter's Executive Chairman, explained in January 2012, Twitter is essentially a

27 high-tech "information utility" and "communications network."

28

20.     Three features of tweets make them uniquely valuable sources of information about users' interests and opinions.  First, unlike posts on social media sites like Facebook, tweets are public—anyone can read them, whether or not they are signed up with Twitter.

21.     Second, Twitter's focus on brief, contemporaneous reporting of what is happening right now provides unique feedback regarding consumers' opinions and reactions to products and services.  For example, users may tweet to complain about long waits in line at Starbucks or to praise the soy latte they purchased from Starbucks.  With 340 million tweets per day, such real-time product information is very valuable to consumer products companies like Starbucks, Apple, or Wal-Mart.

22.     Third, the ways in which Twitter users interact with each other or respond to particular topics provide unique insight into their interests.  Users choose to "follow" other users, and can mention those users in their own tweets or "re-tweet" their content.  These actions demonstrate varying levels of interest and engagement with another user, as well as the influence that certain users have in the Twitter community.  In addition, users can comment on or follow topics by marking keywords with the # symbol, called a hashtag.  These hashtagged words are searchable, so that, for example, searching for "#arabspring" will bring up tweets regarding the Arab Spring.  The practice of hashtagging allows the popularity of particular topics to be monitored and reported, as Twitter does through its Trending Topics feature.

23.     Thus, as Twitter explained in a May 24, 2010 blog post:  "[o]n a daily basis we introduce millions to interesting people, trends, content, URLs, organizations, lists, companies, products and services. These introductions result in the formation of a dynamic real-time interest graph. At any given moment, the vast network of connections on Twitter paints a picture of a universe of interests. We follow those people, organizations, services, and other users that interest us, and in turn, others follow us."

24.     Posts on social media sites like MySpace, Facebook, or LinkedIn are fundamentally different.  These sites are set up to facilitate social communications among groups of friends or business contacts – not to allow public comment on what is going on in the world.  The information is not public.  To view a user's wall, a person must: (a) sign up with the service,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

1   and (b) request to be a "friend" of the user.   Because there are these barriers to accessing other

2   users' posts, there is not the same rich network of interactions among users that Twitter's open,

3   public platform provides.   Companies and government agencies interested in analyzing user data

4   do not view the kind of data available from these social media sites as interchangeable with the

5   kind of data available through Twitter.   Data from these sites can serve as a valuable complement

6   to Twitter data.   Indeed, when PeopleBrowsr was recently approached by a Facebook analytics

7   company called Swaylo that was seeking to sell its assets on favorable terms, PeopleBrowsr took

8   advantage of the opportunity in order to broaden the inputs for its analytics.   The Swaylo data is

9   not a substitute for Twitter data, which is central and critical to PeopleBrowsr's services.

10   PeopleBrowsr's customers and prospective customers are interested in data analytics based on

11   Twitter data.   Supplementing Twitter data with data from other sites is attractive to them –

12   replacing Twitter data with data from other sites is not.

13         25.      Twitter has built a dominant position in the market for its unique brand of public,

14   real-time media.   Most of Twitter's initial competitors, including Pownce, Identi.ca, and Jaiku,

15   have closed down or changed their product offerings.   At the same time, barriers to entry into the

16   market for real-time, public, micro-blogging are substantial.   The value of the Twitter service to

17   its users derives from the 140 million users who generate the content on the site.   Even if a

18   competitor created a superior platform, it is unlikely that it will attract the critical mass of users

19   that would make it a viable alternative to Twitter.

20         26.      Twitter is now, by far, the dominant firm in real-time, public micro-blogging.   No

21   competitor generates the same type of data Twitter provides.   It has complete control over access

22   to this type of data.   This gives Twitter substantial market power over downstream markets using

23   its data, including the Twitter Big Data Analytics market in which PeopleBrowsr participates.

24   **B.      PeopleBrowsr Built a Valuable Business in Reliance on Twitter's
         Commitment to Keep Access to Its Data Open.**

25

26   **1.      Twitter Promised Open Data Access to Encourage Third Parties to
                  Improve Its Service.**

27         27.      When PeopleBrowsr decided to build a business using Twitter's data, it reasonably

28   believed, based on Twitter's representations, that Twitter would maintain an open market for its

-6-

1  data. Twitter had consistently and publicly promised to maintain an "open ecosystem" for

2  software developers who used Twitter data to build useful applications. In other words, Twitter

3  did not plan to control downstream markets that used its data so that Twitter or a select group of

4  partners would be the sole providers in those markets. Rather, access to data would be open to all

5  developers, and businesses in downstream markets would succeed or fail based on market forces.

6         28.     This commitment to an open ecosystem was a core part of Twitter's business

7  strategy. As described by co-founder Evan Williams in November 2011, Twitter was "very

8  basic" when it was launched, "sort of a Model T." In its first years of existence, Twitter made the

9  strategic decision to focus on increasing the number of its users and making sure that its core,

10 bare-bones offering was stable enough to accommodate the growing demand. It devoted few, if

11 any, resources to improving the functionality of its product or the experience of its customers.

12        29.     Instead, Twitter relied on the ingenuity of third party developers to create

13 innovative uses for its data and improve its customers' experience. Twitter made its data openly

14 available to third party developers, who were free to use that data to create new products and

15 services that improved the basic Twitter experience. As a result, says Evan Williams, "a swarm

16 of developers came in and made [Twitter's product] better" which "increased demand" for

17 Twitter. Third-party developers created many of the features now taken for granted on Twitter,

18 such as high quality searching, @replies to tweets, Twitter buttons, the ability to shorten URLs so

19 that users could post website hyperlinks within the 140 characters available on Twitter, and the

20 ability to use Twitter on mobile devices.

21        30.     Twitter consistently and repeatedly articulated its commitment to an open

22 ecosystem. To give just a few examples:

23              a.  Twitter's Rules of the Road for Developers explicitly state, "Twitter maintains

24                  an open platform that supports the millions of people around the world who are

25                  sharing and discovering what's happening now. We want to empower our

26                  ecosystem partners to build valuable businesses around the information

27                  flowing through Twitter."

28

b. On March 1, 2010 Twitter's blog stated that "[e]ven before Twitter was officially a company, we opened our technology in ways that invited developers to extend the service."

c. On January 18, 2008, Twitter's blog stated, "Twitter has a warm spot for innovative simplicity and an open approach to technology development. … [O]ur open approach is more than just good karma. Twitter, Inc. is committed to building a reliable social messaging utility which people trust enough to use every day. Gaining trust means showing our work. When a technology is shared, conversations and understanding form around it."

d. On October 21, 2009, Twitter re-iterated that "[w]e very firmly believe the open exchange of information can have a positive impact on the world. … An open approach means value for users, value for partners, and value for Twitter. … Moreover, there are already tens of thousands of Twitter apps and more to come because people want the choice to consume and create tweets wherever and whenever they prefer."

e. On March 11, 2011, Ryan Sarver, Twitter's Head of Platform, reiterated that "Twitter will always be a platform on which a smart developer with a great idea and some cool technology can build a great company of his or her own."

31. Twitter further encouraged third party developers, repeatedly praising the work of third-party developers and their role in creating Twitter's success. It maintained a Twitter Developer Site and held developer events, including its Chirp! Conference – a high-profile, multi-day event complete with celebrity DJs, that was organized to facilitate dialog between Twitter and its valuable third-party developers. As Twitter's head of platform has acknowledged, "A lot of Twitter's success is attributable to a diverse ecosystem of more than 750,000 registered apps." Twitter has openly admitted that its openness is "not altruistic. We depend on the ecosystem for our success." Twitter co-founder Jack Dorsey described third-party developers as "a fundamental part of [Twitter's] DNA."

1    32.    Twitter explicitly encouraged third-party developers to build their businesses on

2    Twitter's data even though Twitter might not derive any direct monetary benefit from those

3    businesses.  As Twitter's blog acknowledged on May 24, 2010:

4              We believe there are opportunities to sell ads, build vertical

5              applications, provide breakthrough analytics, and more.

6              **Companies are selling real-time display ads or other kinds of**

7              **mobile ads around the timelines on many Twitter clients, and**

8              **we derive no explicit value from those ads. That's fine.** We

9              imagine there will be all sorts of other third-party monetization

10             engines that crop up in the vicinity of the timeline. **We don't**

11             **believe we always need to participate in the myriad ways in**

12             **which other companies monetize the network.  Companies will**

13             **emerge that provide all manner of rich data and meta-data**

14             **services around and in Tweets.**

15   (Emphasis added).  Twitter encouraged companies like PeopleBrowsr to continue to develop

16   applications based on Twitter's platform—even if those applications took revenue streams that

17   Twitter could take for itself.

18    33.    It is not surprising that Twitter would take this open approach, even if it did not

19   directly bring it revenue.  Twitter's open business model -- developing a "platform" that third-

20   party developers use to create new, innovative products and businesses -- is a common and

21   profitable model for internet companies.  Third-party developers provide benefit to the creators of

22   the platforms because they drive more users to the platform and make users' experience better, so

23   that they are more likely to stay customers.  This benefit accrues to the platform creator without

24   its having to own, control, or even directly participate in the revenue of the third-party

25   developers.  High profile companies such as Apple (with its App Store), Microsoft, eBay,

26   Amazon, and Facebook have successfully implemented similar models.

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

**2.      Twitter Offered the Firehose as Part of Its Open Approach.**

34.      As part of its open approach, Twitter also continued to expand access to its data. Twitter created the Firehose to provide developers like PeopleBrowsr access to all of its data so that they could create innovative products.  Twitter described the Firehose as a tool that should be open to all developers, regardless of size, in order to promote innovation.  In December 2009, Ryan Sarver, Twitter's head of platform, announced that Twitter would "provide . . . the firehose for everyone in the system . . . . **[W]hoever needs this type of content we want to be able to provide an open and transparent framework for you to gain access to it.**" (Emphasis added). Twitter stated in a March 1, 2010 blog post that:

> **Full investment in this ecosystem of innovation, means all our partners should have access to the same volume of data, regardless of company size.**  More than fifty thousand interesting applications are currently using our freely available, rate-limited platform offerings.  **With access to the full Firehose of data, it is possible to move far beyond the Twitter experiences we know today.**  In fact, we're pretty sure that some amazing innovation is possible."

(Emphasis added).  At an April 2010 Question and Answer session during the Chirp! Conference, with Twitter's CEO Evan Williams, co-founder Biz Stone, Director of Platform Ryan Sarver, COO Dick Costolo, and VP of Product Jason Goldman, Twitter stated that it wanted to get Firehose access to as many developers as possible and was hiring employees to help ramp up access.  Such widespread, open access fit Twitter's business model.  As Evan Williams stated in an interview in November 2011, the original purpose of the Firehose was not to earn revenue but to encourage third parties to distribute tweets.

35.      Twitter reaped great benefit from its commitment to openness, which induced a swarm of developers to devote their time and money to improving Twitter's service and reach. Twitter's improving customer experience allowed it to outpace its rivals and become the dominant player in its market.  As Farhad Manjoo recently wrote on Slate.com, "In Twitter's

1  earliest days, the service was primarily built around the idea of sending and receiving messages

2  via SMS with a fairly crude Web interface as a fallback.  But the service came with a wide open

3  Application Programming Interface (API) that let people write apps for computers and

4  smartphones that could access the Twitter stream.  This capability is what made it possible for

5  Twitter to scale up."

6        36.     In large part because of the contributions of third-party developers' applications,

7  products, and services, Twitter grew rapidly from its inception, logging 400,000 tweets per

8  quarter in 2007.  By the middle of 2010, the service had 65 million tweets posted each day.  By

9  the time the company reached its sixth anniversary in March 2012, Twitter had grown to 140

10  million active users and 340 million tweets per day.  Such growth allowed Twitter to quickly

11  surpass its competitors and emerge as the undisputed leader in the "micro-news" field.

    **3. Twitter's Open Ecosystem Created Downstream Markets, Including PeopleBrowsr's Twitter Big Data Analytics Market.**

   37. Twitter's commitment to an open ecosystem generated two general types of downstream markets for Twitter-related products.  First, there are consumer applications that improve the core Twitter experience for Twitter users, such as applications that allow Twitter to work on mobile devices or desktop applications that provide greater functionality than that found on the basic Twitter website.  Second, there are data analytics applications, such as PeopleBrowsr's, that do not display the core Twitter consumer interface, but instead analyze Twitter's data to provide insight regarding the behavior of Twitter users, and by extension the marketplace in general.

   38. In turn, there are two fundamentally different types of Twitter data analytics markets: (a) a general data analytics market which uses limited amounts (e.g., samples) of Twitter data to address particular users' needs (e.g., getting a general sense of how often a search term is mentioned on Twitter); and (b) a "Twitter Big Data Analytics" market that generates more sophisticated, deeper insights by analyzing very large amounts of Twitter data.  The level of sophistication needed to participate in the Twitter Big Data Analytics market is substantially

-11-

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    higher than in the general data analytics market.  The sheer volume of data requires advanced

2    technology and substantial resources.

3          39.      PeopleBrowsr provides Twitter Big Data Analytics, along with a handful of other

4    companies.  The services PeopleBrowsr's users expect cannot be provided by general data

5    analytics companies.  Only by having access to the very highest levels of Twitter data access can

6    PeopleBrowsr compete in the Twitter Big Data Analytics market and provide its users with the

7    services they expect.

8          40.      PeopleBrowsr is either the sole provider or one of two providers of three Twitter

9    Big Data Analytics services: (a) Influence Measurement, where PeopleBrowsr's Kred product

10   provides a unique visual stream that allows consumers to identify others with like interests, as

11   well as those who are influential in those communities; (b) Action Analytics for Government and

12   Enterprise, which tracks all activity related to a brand or particular markets in order to identify

13   trends; and (c) Financial Data Services, which spots trends in Twitter data in order to more

14   quickly detect when market changes are occurring.  PeopleBrowsr is one of two viable providers

15   of Influence Measurement.  It is the sole provider of Action Analytics for Government and

16   Enterprise.  PeopleBrowsr and Dataminr, a close Twitter partner with Firehose access, are the

17   only Financial Data Services providers.  DataSift, another close Twitter partner, also intends to

18   offer Financial Data Services.

19          **4.       Twitter Has Offered PeopleBrowsr the Firehose for Over Four Years**
              **as Part of Its Open Platform.**
20

21          41.      For over four years, PeopleBrowsr has had a successful relationship with Twitter.

22   PeopleBrowsr's relationship with Twitter began when its CEO, Jodee Rich, met Twitter's Chief

23   Technology Officer, Alex Payne, at a conference in early 2008.  In February 2008, Mr. Rich

24   introduced Twitter co-founder Biz Stone to his "deep twitter" applications by email.  Mr. Stone

25   responded that "[a] deep Twitter app sounds very interesting!  I'd love to hear more about it."

26   PeopleBrowsr began to communicate regularly with Twitter regarding its product development

27   and plans.  In March 2008, Mr. Rich gave Twitter co-founder and CEO, Evan Williams, a

28   demonstration of the PeopleBrowsr alpha product.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

42.     On July 9, 2008, Mr. Rich emailed Evan Weaver, a Senior Database Engineer, and Alex Payne at Twitter, copying Biz Stone, Twitter's co-founder, seeking permission to build a cache of stored tweets (which became PeopleBrowsr's data mine) and to "resyndicate" that cache of tweets by passing those tweets on to third parties for their own use. Mr. Weaver gave PeopleBrowsr permission to build the cache but asked that it "hold off" resyndicating.

43.     On July 12, 2008, Mr. Rich emailed Mr. Weaver and Mr. Payne asking for the full Firehose feed. Mr. Rich explained that PeopleBrowsr was one of Twitter's earliest developers, launching shortly after Twitter went online, and that PeopleBrowsr had invested over $500,000 and 10,000 hours on the project. Mr. Rich described PeopleBrowsr as comprised of a "serious and twitter-committed group of developers" who were then "feeling very much at sea" without the full Firehose feed they needed. Mr. Payne reassured Mr. Rich that "there is no need to feel at sea. Given your business commitment to the Twitter platform, it sounds like we need to have a corresponding business conversation."

44.     PeopleBrowsr and Twitter engaged in this "business conversation" in July 2008, entering into a written Content License Agreement that provided PeopleBrowsr access to all of Twitter's developer services, including full access to the Firehose. Twitter did not charge PeopleBrowsr any licensing fee for access to the Firehose, but merely required PeopleBrowsr to help promote Twitter by including the Twitter logo or other attribution on any screen within PeopleBrowsr's products. This structure was fully consistent with Twitter's repeated representations that it would maintain an open ecosystem and desired to promote the free and open use of its data.

45.     In June 2010, as PeopleBrowsr's continued to grow and succeed, Twitter and PeopleBrowsr renewed the license agreement. For access to the Firehose, the renewed contract charged PeopleBrowsr the greater of: (a) a minimum monthly fee of $15,000, which would increase by $5000 per month with a cap of $100,000 or (b) 25 percent of PeopleBrowsr's gross revenue, net of third party revenue share. PeopleBrowsr was willing to pay Twitter 25 percent of its gross revenue because of Twitter's market power – there is no reasonable substitute for the input that Twitter provides.

-13-

1    46.    Twitter's revenue under this agreement has steadily grown, and PeopleBrowsr now

2    pays Twitter more than $1 million per year for its Firehose access.

3    47.    PeopleBrowsr reasonably expected when it contracted with Twitter and built a

4    business that relied on access to the Firehose that it would obtain the benefits of Twitter's

5    promised open approach.  It did not expect that Twitter would take away PeopleBrowsr's access

6    in order to disadvantage PeopleBrowsr in the marketplace.

7    48.    Though the agreement contained a 30 day termination provision, PeopleBrowsr

8    understood that the provision would be exercised consistently with Twitter's obligation to provide

9    an open ecosystem.  Twitter repeatedly and publicly described the data it was selling as part of an

10   open ecosystem.  PeopleBrowsr understood that the parties' contractual rights and obligations

11   would be consistent with this fundamental attribute of the Firehose service PeopleBrowsr was

12   purchasing.  Part of such an open ecosystem is a commitment not to terminate data access in

13   order to control Twitter markets and interfere with competition. Twitter assured PeopleBrowsr's

14   CEO, Jodee Rich, that the termination provision would be exercised in accordance with that

15   commitment.  When he asked Twitter's lead negotiator, Kelton Lynn, about the provision, Lynn

16   stated that Twitter would respect PeopleBrowsr's rights as a developer, and that the provision

17   merely made it easier to terminate if PeopleBrowsr engaged in unacceptable conduct.

18   PeopleBrowsr did not expect that the provision entitled Twitter not to provide what it had

19   promised and it had purchased: access to an open ecosystem.

20   49.    In addition, Twitter has repeatedly assured PeopleBrowsr that it was committed to

21   its open approach.  For example, on July 13, 2009, Alex Payne, a senior employee at Twitter told

22   Mr. Rich that Doug Williams, Ryan Saver, and he were "all fighting to keep access to the

23   Firehose and other APIs as open as possible.  We're on the same page as you."

24   50.    As a result, PeopleBrowsr reasonably believed that Twitter would allow it to

25   compete freely in the marketplace, and would not restrict data access in order to take

26   PeopleBrowsr's opportunities for itself or its partners.

27

28

1            **5.**      **PeopleBrowsr Provides Valuable Insight Utilizing the Full Firehose.**

2       51.     PeopleBrowsr uses the Firehose to empower its users to gain value from the

3 massive amount of data generated through Twitter. PeopleBrowsr collects, filters, and analyzes

4 over 340 million tweets per day in order to (a) identify communities of people with similar

5 interests; (b) identify leaders who have the ability to spread a message or to influence others to

6 take action; (c) track the reaction of users and communities to messages and brands; and (d)

7 provide its users with a unique visual stream of Twitter data that enables them to learn about

8 influential people with similar interests.

9       52.     PeopleBrowsr's real-time scoring engine receives three to four thousand tweets

10 every second through the Firehose; extracts useful information from the tweets, such as users'

11 location, gender, and communities; processes and tags the tweets for use in PeopleBrowsr's

12 analytics; and stores the tweets in its 100+ Terabyte data mine. PeopleBrowsr has received and

13 scored over 1,000 days of tweets for over 120 million people.

14       53.     PeopleBrowsr's products use this comprehensive data mine to conduct complex,

15 resource-intensive analyses to empower web users to make the Twitter data stream useful,

16 identify people with influence, and to allow companies, government entities and individuals to

17 monitor users' reaction to their brand, as well as the effectiveness of marketing campaigns.

18 PeopleBrowsr's leading offerings are Kred, its Playground and Command Center products, and

19 its API platform.

20       54.     **Kred.** Kred uses PeopleBrowsr's 1000-day data mine to rate the Influence and

21 Outreach of over 120 million individuals in over 200 different online communities.

22 "Influence" is measured by users' ability to inspire other Twitter users to engage with them by

23 retweeting (i.e., reposting) their tweets, replying to their tweets, mentioning them in their tweets,

24 or "following" them. Such activity reflects a user's ability to influence other users and spread a

25 message. "Outreach," by contrast, measures users' willingness to spread others' messages, as

26 reflected by retweets, replies, and mentions of others.

27       55.     One of PeopleBrowsr's key innovations is to track Influence and Outreach within

28 specific communities of interest, as well as the population at large. Kred places users in

1  communities based on the interests they express through Twitter Bios, the hashtags and keywords

2  in their posts over the last 1,000 days, and the response of communities to their tweets. Kred can

3  then identify the persons with the most influence in those communities. The ability to identify

4  and sort users into communities depends on a comprehensive database of users' Bios and activity.

5       56.     Kred also provides historical information regarding influential individuals, such as

6  what topics and Twitter users those individuals have referenced in their tweets, the words they

7  most frequently use, and the top Twitter users, locations and communities mentioning them. This

8  historical information can only be provided if PeopleBrowsr has access to the historical data

9  provided through the Firehose.

10       57.     Kred Story presents Twitter data in a unique visual stream that highlights relevant

11  information and allows users to learn about people with influence in communities they are

12  interested in. It provides a complete visual history of any user's influence, and allows users to

13  identify and learn more about key interactions influencers have with others.

14       58.     **Playground and Command Center.** PeopleBrowsr's "Playground" and

15  "Command Center" products provide a range of tools that allow companies and government

16  entities to monitor the real-time popularity of their brand, identify influential people who can

17  persuade others to use their brand, and track the effectiveness of their marketing campaigns. By

18  tracking all mentions of a brand or product for the past 1000 days, PeopleBrowsr is able to

19  analyze, among other things: (a) users' sentiment toward the brand (i.e., whether they like it or

20  have complaints), as well as trends in that sentiment; (b) the degree of users' engagement with the

21  brand; (c) which of the brand's tweets are being retweeted the most; (d) the influence of users

22  engaging with the brand; (e) the brand's top communities and locations; and (f) the words most

23  frequently associated with the brand.

24       59.     Playground and Command Center also allow companies to evaluate the

25  effectiveness of their marketing campaigns by tracking what happens in response to their Twitter

26  campaigns, including how many people click on hyperlinks in their tweets, how many people

27  retweet their tweets, and how many new "follows" their campaigns garner.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

60.     **API.**  PeopleBrowsr's API platform makes its innovations available to other developers to create custom applications for browsing, searching and analyzing PeopleBrowsr's data mine. For example, an online social media news blog, Mashable, uses PeopleBrowsr's API to create "mRank." "mRank' calculates, on a scale of 1 to 100, the amount of buzz generated by a particular term by analyzing conversations across Twitter, Facebook, and blogs.  Radian6 integrates Kred into its customer relationship management products so that their customers can obtain Influence and Outreach scores for their sales targets.  eBay uses PeopleBrowsr's API to track the number of times its service or other terms are mentioned.

61.     PeopleBrowsr also develops custom applications for its customers, and continuously innovates to find new uses for Twitter data.  For example, it has been engaged by defense contractor Strategic Technology Research to detect trends in social media that may identify security threats.  There are many uses for Twitter data in the expanding markets in which PeopleBrowsr participates, and PeopleBrowsr has the potential to grow exponentially as it continues to innovate in those markets.

### 6.     The Firehose Is Essential to PeopleBrowsr's Business.

62.     The data that PeopleBrowsr receives through the Twitter Firehose is an essential input for its business.  Losing Firehose access would devastate PeopleBrowsr's business, causing harm that cannot be compensated by damages.  Without the full Firehose, PeopleBrowsr could not provide the products that its contracting partners and web users expect.  It would suffer severe and irreparable damage to its goodwill and business relationships.  Having a mere sample of Twitter's data – while perhaps sufficient for some general data analytics companies that do not offer the sophisticated analytics PeopleBrowsr provides – is not sufficient for PeopleBrowsr to provide its services.

63.     The Firehose is essential to providing results in a **timely** manner.  PeopleBrowsr's analytics require massive amounts of computing power and large amounts of time.  Multiple, layered analyses are often required to provide users with the information they seek. For example, to score users' influence within a community, PeopleBrowsr must first analyze users' Bios to find the members of communities (e.g., all people in the CEO Community), then

-17-

1    track all the reactions to the tweets posted by members of that community to arrive at their

2    Influence scores, and then compare Influence across all the members of the community.  If

3    PeopleBrowsr had to run these analyses from scratch every time its customers posted a query, it

4    could take hours or days – by the time the analysis was complete it would be out of date.  With

5    access to all Twitter activity through the Firehose, PeopleBrowsr does not need to wait for a user

6    to make a query.  It can build a database of pre-built, underlying analytics (such as members of a

7    community or numbers of mentions of a brand) that are refreshed in real time as new data comes

8    in, and can be used to build the more complex products PeopleBrowsr provides to its users.

9         64.    The Firehose is required to detect **emerging trends**.  PeopleBrowsr offers its

10   clients highly sensitive tools to identify trends in Twitter activity at a very early stage.  The ability

11   to detect trends more quickly than others is very important to financial services who want to

12   detect changes in sentiment toward a stock, government and security agencies who want to see

13   early indicators of threats, and large enterprise clients who want to analyze the components of

14   trends effecting their brands.  Initial signals that a trend is forming can be very small: a single

15   tweet might start an avalanche of Twitter activity.  A sample could easily miss the early signs of a

16   trend – with 10% of the data (Gnip and DataSift's standard offering), you would have only a 10%

17   chance of having access to the key tweet that sets off a trend.  Complete real-time data is

18   essential.

19        65.    The Firehose provides all the tweets for **scoring** and ranking influence.

20   PeopleBrowsr scores and ranks individuals' influence within communities (college students, for

21   example, or yoga practitioners).  In order to do this, it must see what interests are mentioned in **all**

22   users' posts and Twitter Bio data in order to determine **all** the members of those communities.

23   PeopleBrowsr must identify **all** members of the communities in order to provide a useful,

24   meaningful ranking.  A user's rank within ten percent of a community (e.g., "You are the most

25   influential of the 10% of doctors we happen to have information about") is not a useful metric,

26   because that rank could vary widely depending on how influential the people who happen to be in

27   the sample are.  PeopleBrowsr needs to compare individual influence scores to those of other

28

1    Twitter users in order to provide a normalized score, so that scores provide a meaningful

2    comparison between users.

3          66.      The Firehose provides necessary **historical** data.  PeopleBrowsr provides its

4    clients with complex analytics that require that PeopleBrowsr's algorithms have instant access to

5    certain "building block" analyses of historical data, such as the historical number of mentions of a

6    brand, the acceleration in the number of retweets of a client's tweets, or the communities most

7    frequently mentioning a certain Twitter user.  These underlying historical analytics are

8    themselves time-consuming, requiring PeopleBrowsr to comb through a massive database for

9    relevant data.  To provide timely and accurate results, these "building blocks" must constantly be

10   refreshed based on a complete data set provided in real time; otherwise, part of what a client is

11   looking for will almost certainly be missing.  Clients also frequently want to see such underlying

12   historical data, such as words associated with their brand or the top communities mentioning an

13   influential user, rapidly.  These analytics are only possible if PeopleBrowsr is receiving all

14   Twitter data in real time through the Firehose.

15         67.      For all of these reasons, PeopleBrowsr cannot provide the products its contracting

16   partners, business prospects, and web users expect without the full Firehose.  Though Twitter has

17   suggested that PeopleBrowsr could offer services by merely sampling Twitter's data, it is not

18   possible to provide the high quality, sophisticated, Twitter Big Data Analytics PeopleBrowsr's

19   clients expect in that manner.  The full Firehose is necessary for key PeopleBrowsr innovations,

20   such as measuring influence in communities, that differentiate it from less sophisticated data

21   analytics providers.  Though Twitter has referred in negotiations to "data analytics" providers, in

22   the broadest sense, that do business without the Firehose, these companies do not provide the type

23   of sophisticated, Twitter Big Data Analytics that PeopleBrowsr and a handful of competitors

24   provide.  They are not in the same market as PeopleBrowsr.

25         68.      As a result, cutting off Firehose access would cause irreparable harm to

26   PeopleBrowsr's business and its business relationships.  Accordingly, PeopleBrowsr has

27   repeatedly communicated to Twitter that access to the entire Firehose feed is essential to

28   PeopleBrowsr's business.  For example:

- On July 6, 2009, Mr. Rich told Twitter by email that access to the full Twitter Firehose was "essential" to PeopleBrowsr's core products.
- On July 12, 2009, Mr. Rich sent another email to Twitter identifying six features of PeopleBrowsr's products that "would be very hard to continue to offer without the full [Firehose] feed."
- In January 2010, during negotiations for the current Firehose agreement, Mr. Rich sent Twitter a proposal outline that described the need for access to the Firehose.
- On May 25, 2010, Mr. Rich told Twitter by email that suspending Firehose access "would be a commercial disaster" for PeopleBrowsr.
- On January 19, 2011, Mr. Rich met with Twitter's Ryan Sarver and Doug Williams, and again explained the need for Firehose access.
- On March 21, 2011, Mr. Rich told Twitter by email that switching from the full Firehose to what Twitter referred to as the "half hose" (providing a randomly selected half of Twitter's data) "would shut us down."

69.     Twitter has always known that cutting off PeopleBrowsr's Firehose access would devastate PeopleBrowsr's business.

**C.      Twitter Seeks to Destroy PeopleBrowsr's Business In Order to Eliminate Competition in Data Analytics Markets.**

70.     After four years in a mutually beneficial relationship, Twitter has threatened to cut off PeopleBrowsr's Firehose access on November 30, 2012.  It has done so after months of meetings in which Twitter extracted sensitive, confidential information regarding PeopleBrowsr's technology and business prospects by stating that disclosure of this information was necessary to justify PeopleBrowsr's continued access to the Firehose.

71.     Twitter intends to cut off PeopleBrowsr's Firehose access so that it can take PeopleBrowsr's business opportunities and restrain competition in the Twitter Big Data Analytics market in which PeopleBrowsr participates.

72.     Seeking additional revenues, Twitter has engaged in a pattern and practice of converting downstream markets from open ecosystems to tightly controlled markets dominated by Twitter and select partners.  It has already converted consumer markets (e.g., mobile applications) into tightly controlled markets.  It now seeks to do the same in the Twitter Big Data Analytics market in which PeopleBrowsr participates.

73.     Twitter has made moves to enter the Twitter Big Data Analytics markets, developing its own analytics capabilities and acquiring or forming partnerships with other leading data analytics companies.  In order to ensure that Twitter will dominate the market, it has denied competitors and potential competitors access to the Firehose and forced them to use its data resellers Gnip and DataSift, who only offer a fraction of Twitter's data.  Because Twitter and its partners continue to enjoy Firehose access, other providers will not be able to compete in a market that is explicitly based on analyzing high volumes of Twitter data to find deep insights.

74.     Twitter seeks to cut off PeopleBrowsr's Firehose access in order to eliminate it as a competitor in the Twitter Big Data Analytics market where it is a major player and interfere with PeopleBrowsr's business relationships.

> **1.     Twitter Seeks to Dominate Downstream Twitter Markets in Order to Extract Greater Revenues.**

75.     Investors have invested over $1 billion in Twitter.  Nonetheless, as Twitter co-founder and former CEO Evan Williams explained in an interview on November 18, 2010, Twitter's early years were focused on expanding its user base to the exclusion of efforts to monetize its service.  This began to change in 2010.

76.     On April 13, 2010, Twitter's blog discussed the growing pressure for Twitter to profit from its enormous user base: "Stubborn insistence on a slow and thoughtful approach to monetization—one which puts users first, amplifies existing value, and generates profit has frustrated some Twitter watchers. Believe me, when your name is Biz and you're a co-founder of Twitter, it also means putting yourself at the mercy of folks like Stephen Colbert who hit home runs with lines like, 'So, I assume that 'Biz' in 'Biz Stone' does not stand for 'Business Model.''"

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

77.     As the blog noted, Twitter had increasingly come under fire – from investors and in the public media – for its failure to turn a profit.  Seeking greater revenues, Twitter began to exert greater control over downstream markets, using its sole control over Twitter data to convert those markets from open ecosystems to Twitter-dominated markets.

    **2.**  **Twitter's Chief Weapon in Restraining Competition Is Limiting Access to Data.**

78.     Twitter describes itself as an "information utility," and it is just that. PeopleBrowsr, like other businesses using Twitter data, depends on that data just as much as electricity or water.  Without it, PeopleBrowsr does not have essential data it needs to continue in business.  Twitter controls an essential input for PeopleBrowsr's and others' businesses and can eliminate competition by restricting access to that input.

79.     There are now four levels of access to Twitter data, designed to ensure that only Twitter and closely controlled partners have access to all of Twitter's data:

- Most developers have access to the REST API, which allows retrieval of a small fraction of the hundreds of millions of tweets that are posted each day, as well as very limited historical data.

- The next level of access is streaming access, which provides no historical data whatsoever, and allows developers to obtain a live stream of tweets related to a limited number of users and terms.

- Through Twitter's partners Gnip and DataSift, developers can obtain larger amounts of Twitter data, with limited historical access. Gnip and DataSift cannot provide access to all of Twitter's data, however, without explicit approval from Twitter, which has never been granted.

- The highest level of access is the Firehose, which provides all Twitter data, and is restricted to Twitter and about twenty partners, despite Twitter's original commitment to make access to all tweets through the Firehose widely available.

80.     As a result of this four-tiered structure, the vast majority of developers operate at a disadvantage to Twitter and a select group of closely controlled partners.  In markets that are based on information, access to that information is essential to competition.  Giving out full access to some developers and not others gives Twitter a competitive advantage that other companies simply cannot overcome.  This is particularly true in the Twitter Big Data Analytics market, which depends on very high volumes of Twitter data to provide the most sophisticated analytics.

> **3.     PeopleBrowsr's Threatened Termination Follows Twitter's Successful Efforts to Take Over Other Downstream Markets.**

81.     As described above, Twitter's open approach created two general types of markets: (a) consumer markets, which enhance the basic Twitter experience for Twitter users; and (b) data analytics markets, which analyze Twitter's data to provide insight to third parties. Twitter has already effectively converted consumer markets from open ecosystems to tightly-controlled, Twitter-dominated markets.  Three markets that illustrate Twitter's approach are (a) the mobile application market; (b) the desktop application market; and (c) the advertising market.

82.     **Mobile Applications.** There was once a diverse and healthy mobile marketplace, with thirty-eight companies offering applications to access Twitter on mobile devices.  Twitter promoted these companies and showcased their applications.  Then, as it became clear that mobile applications were a major growth area, Twitter developed plans to enter that market.  In 2009, Twitter identified mobile applications as a major growth area, and continued to encourage third parties to develop mobile applications.  Then, in April 2010, Twitter announced its acquisition of Atebits, the maker of the popular iPhone Twitter application Tweetie, and the leading mobile Twitter application developer.  Tweetie became Twitter's own mobile application, Twitter for iPhone.

83.     Developers reacted with panic because the Atebits acquisition signaled that Twitter would no longer foster an open ecosystem for third parties to develop the mobile marketplace, but wanted to take the mobile market for itself. Ryan Block, an editor of a

1    prominent technology magazine, stated that developers relying on Twitter to provide them equal

2    access were "officially on notice." Another editor succinctly stated "bye bye, ecosystem."

3    84.    Developers' concerns were well founded.  Twitter implemented a series of

4    changes intended to secure its dominance in the mobile marketplace.  It started with an inherent

5    data advantage, because Twitter had access to the full Firehose, while competitors had to use

6    restricted data sources.  In addition, Twitter altered security settings and permissions for third

7    party applications, limited features available to third parties, and terminated data access for

8    competing mobile developers who purportedly violated vague and shifting terms of service.

9    85.    Twitter's efforts were highly effective.  Out of 38 mobile applications that once

10   existed, only 11 remain.  On March 11, 2011, Twitter's Head of Platform Ryan Sarver stated, "the

11   number and market share of consumer client apps that are not owned or operated by Twitter has

12   been shrinking.  According to our data, 90% of active Twitter users use official Twitter apps on a

13   monthly basis."   Sarver noted that Twitter had "developed official apps for the Mac, iPad,

14   Android and Windows Phone . . . . As a result, the top five ways that people access Twitter are

15   official Twitter apps."

16   86.    Having rigged the game so that it could dominate the mobile market,  Twitter then

17   used this dominance to justify closing down the open ecosystem it had promised developers.

18   Citing the large percentage of users who had come to use Twitter's application, and the need to

19   provide a more "consistent user experience," Sarver announced on March 11, 2011 that Twitter

20   would be taking over the consumer applications market altogether: "Twitter will provide the

21   primary mainstream consumer client experience on phones, computers, and other devices by

22   which millions of people access Twitter content (tweets, trends, profiles, etc.), and send tweets. . .

23   . [D]evelopers ask us if they should build client apps that mimic or reproduce the mainstream

24   Twitter consumer client experience.  The answer is no."  The open mobile ecosystem was now a

25   Twitter-dominated market.

26   87.    **Desktop Applications.**  A similar scenario played out in the desktop application

27   market.  Twitter initially lacked the capability to develop Twitter applications that ran on Macs

28   and PCs, and promoted an open ecosystem of fifteen desktop application developers.  Once it

1   identified the desktop market as a growth area, however, it acted to take control of that market.

2   Its acquisition of Atebits was a first step in this process, as Atebits owned a popular desktop

3   application in addition to the leading mobile application.  Later, Twitter acquired the leading

4   desktop application, TweetDeck.  Through the same types of data limitations, changes in security

5   requirements, limits on features, and termination of data access for competitors, Twitter

6   eliminated all but two competitors in the desktop application market.

7          88.    **Advertising.**  There were once more than twenty developers offering Twitter

8   advertising.  Twitter initially encouraged developers in this area, as it had decided not to focus on

9   advertising.  Once Twitter became focused on monetization, however, it quickly acted to

10  dominate the advertising market.  After announcing the launch of its Promoted Tweets product,

11  Twitter imposed new rules that made it harder for third parties to offer Twitter advertising.  It

12  took the above-described steps to cut down on the number of mobile and desktop applications that

13  could compete with Twitter for advertising viewers.  And it acquired the leading advertising

14  provider, AdGrok, using its advantages in the marketplace to drive out competition.  Of the more

15  than twenty developers that once competed in this market, only four remain.

16         89.    Twitter now dominates downstream consumer markets where an open ecosystem

17  of developers previously thrived.  It engaged in a repeated pattern: (a) encouraging third parties'

18  development of promising markets through promises of openness; (b) identifying the most

19  successful markets; (c) acquiring the capability to provider services in those markets; and then (d)

20  using its superior data access and control over competitors' terms of data usage to drive any

21  significant competition out of the market.

22             **4.    Twitter Now Seeks to Cut Off PeopleBrowsr's Firehose Access in
                        Order to Restrain Competition in the Twitter Big Data Analytics**
23                      **Market.**

24         90.    Despite Twitter's actions to eliminate competition in consumer markets,

25  PeopleBrowsr reasonably believed that it could continue to build its business on the Firehose.

26  Twitter's actions were taken after PeopleBrowsr had already committed massive amounts of time

27  and money to building a business that relies on Twitter.  Twitter's rationale for its takeover of

28  consumer markets also had no application to PeopleBrowsr.  Twitter asserted that it needed to

1   assert greater control over consumer applications in order to provide a uniform Twitter experience

2   to consumers.  PeopleBrowsr does not provide consumers with the core Twitter experience.  For

3   example, consumers do not use PeopleBrowsr to post tweets.  Rather, PeopleBrowsr uses Twitter

4   data to create insights for third parties.

5          91.      In addition, during its moves to take over consumer markets and afterwards,

6   Twitter has continued to represent publicly that it is committed to its open ecosystem, has

7   encouraged data analytics in particular, and has encouraged PeopleBrowsr to continue its

8   relationship with Twitter.  For example:

9          •   In the very post in which Ryan Sarver announced that developers should not build

10             consumer applications, he listed data analytics as one of the "key areas where

11             ecosystem developers are thriving" and said, "We will continue to support this

12             innovation."

13         •   In a September 1, 2011, blog post, Twitter co-founder Jack Dorsey stated that

14             Twitter's "relationships with consumers and developers are a primary measure of

15             our success" and that "[o]ur ongoing commitment is to give you the structure,

16             tools, resources, and support you need to build your businesses as you leverage the

17             power of Twitter."

18         •   In October 2011, Ryan Sarver stated in an interview, "There are great businesses

19             to be built on top of Twitter; we're trying to help people see that opportunity."

20         •   On April 27, 2012, Seth Bindernagel of Twitter's platform team stated, "Some of

21             the best things about the Twitter platform are the excellent implementations of the

22             products and API by ecosystem partners."

23         •   On August 29, 2012, Twitter listed Analytics Products as one of the three types of

24             applications it seeks to encourage through its Twitter Certified Products Program.

25         •   Today, Twitter continues to state its support for developers, stating explicitly in its

26             Developer Rules of the Road, "Twitter maintains an open platform that supports

27             the millions of people around the world who are sharing and discovering what's

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-26-

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

1         happening now. We want to empower our ecosystem partners to build valuable

2         businesses around the information flowing through Twitter."

3       92.    As it turned out, this encouragement was just part of Twitter's standard practice in

4   markets it believes it may want to expand into.  After encouraging PeopleBrowsr and other

5   developers to develop innovative products that opened up lucrative new markets analyzing

6   Twitter data, Twitter has now acted to take control of those markets.

7              **a.**    **Twitter Wants to Participate in the Twitter Big Data Analytics Market.**

8

9       93.    In June 2010, Twitter acquired Smallthought Systems, a data analytics start-up,

10  stating that Smallthought's developers "have joined our analytics team and will focus on

11  integrating [their] ideas . . . into our current tools and building innovative realtime products for

12  our future commercial partners."  Five months later, in November 2010, Twitter announced that it

13  had developed its own analytics product.  Since then, Twitter has continued to acquire data

14  analytics companies, including BackType, Summify, Hotspots.io, and Bagcheck.  In addition,

15  Twitter has provided full Firehose access to closely controlled data analytics partners, such as

16  Socialflow, Crimsonhexagon, Sysomos, and Dataminr.  Its data reseller partner DataSift has also

17  announced its intention to enter the data analytics market.  Twitter has referred to its relationships

18  with these companies as "formal partnerships" that are "driven by Twitter."  These companies

19  were also recently listed as Twitter Certified Products, a designation reserved for companies that

20  are "good partners" to Twitter, facilitate Twitter's goals, and allow Twitter to suggest "areas of

21  improvement" for the companies.

22      94.    The same month that Twitter announced its internal data analytics product, Twitter

23  announced partnerships with data re-sellers Gnip and DataSift to re-sell its data. It also announced

24  that all but a handful of data analytics providers would need to obtain their data from these re-

25  sellers rather than the Firehose.  Because access through Gnip or DataSift is substantially more

26  limited than Firehose access, this had the effect of limiting competitors' access to data.  Though

27  Twitter claimed that Gnip and DataSift were going to be the new, transparent standard for

28

-27-

1    everyone to obtain data access, Twitter continues to offer the Firehose to closely controlled

2    partners.

3          95.    In or about February 2011, Twitter further limited third party access to its data by

4    announcing that it would no longer allow "whitelisting" for its API.

5          96.    Twitter has now created two tiers of data analytics providers: (1) Twitter and its

6    close partners, who have unrestricted access to the Firehose and can analyze all of Twitter's data;

7    and (2) everyone else, who can only obtain some subset of that data, and can only put it to

8    restricted uses.

9          97.    Twitter is poised to take control of the Twitter Big Data Analytics market as it has

10   other downstream Twitter markets.  Limiting access to data is an especially effective means of

11   restraining competition in data analytics markets, which explicitly derive their value from the

12   ability to analyze that very data.  The sophisticated Twitter Big Data Analytics market in which

13   PeopleBrowsr participates is particularly dependent on Twitter, because PeopleBrowsr and other

14   developers need access to the very highest volumes of data in order to provide their services.  By

15   limiting data access, Twitter can assure that it or its closely controlled partners dominate the

16   Twitter Big Data Analytics market.  Whatever the merits of Twitter's claim that it needed to take

17   over consumer markets in order to ensure a "uniform Twitter experience," that rationale has no

18   application in the Twitter Big Data Analytics market: PeopleBrowsr and its competitors do not

19   provider consumers with the core Twitter experience.  Twitter simply seeks to restrain

20   competition.

21          b.    **Twitter Has Threatened to Cut Off the Firehose in Order to**
              **Eliminate PeopleBrowsr as a Competitor.**
22

23          98.    Twitter threatens to cut off PeopleBrowsr's access to the Firehose on November

24   20, 2012 in order to eliminate PeopleBrowsr as a competitor.  Beginning in 2011, Twitter told

25   PeopleBrowsr that it intends to restrict Firehose access to a limited number of "Twitter-driven"

     partnerships that it can closely control.  At the same time, under the guise of discussing a
26
     continuing Firehose agreement with PeopleBrowsr, it intensified its efforts to obtain confidential
27
     information regarding PeopleBrowsr's innovations and business prospects.  Then, once it had
28

1   obtained PeopleBrowsr's confidential business information, Twitter stated its intention to

2   terminate PeopleBrowsr's Firehose access, knowing that this would eliminate PeopleBrowsr as a

3   competitor and interfere with PeopleBrowsr's business relationships.

4         99.    Twitter has always expected PeopleBrowsr to frequently report on its business

5   plans and opportunities, ostensibly as part of Twitter's efforts to encourage and work with a close

6   partner. For example, beginning in July 2010, PeopleBrowsr has provided Twitter with its

7   monthly sales reports, to enable Twitter to monitor the amount of PeopleBrowsr's gross revenue

8   under the license agreement. On October 1, 2010, Mr. Rich emailed Twitter describing the

9   company's plans to build a 5,000 to 10,000 square foot facility for its Enterprise command Center

10  in San Francisco. On May 6, 2011, Mr. Rich emailed Twitter, providing PeopleBrowsr's April

11  revenue figures and his hopes to secure three big contracts that would raise its monthly revenue to

12  $250,000. Through these communications and others, Twitter was aware of PeopleBrowsr's

13  growing business and the opportunities to earn revenue in the markets PeopleBrowsr serves.

14        100.    Beginning in 2011, Twitter told PeopleBrowsr that it intended to reserve Firehose

15  access for partnerships that were "driven by Twitter." In April 2011, PeopleBrowsr requested to

16  state on its website that it is a "Twitter Firehose Partner," as three other companies using

17  Twitter's Firehose were already doing. Twitter's Doug Williams refused by an email dated April

18  13, 2011, stating, "[W]e are working much more closely with these companies than the handful

19  of companies that licensed the Firehose around this time of last year. At the highest of levels, the

20  partnerships below have all been driven by Twitter as opposed to inbound interest for our data as

21  we were looking to fill very specific product or offering holes."

22        101.    Despite Twitter's interest in "Twitter-driven" partnerships, Twitter made no hint

23  that it intended to cut off PeopleBrowsr's Firehose access. Instead, it used the prospect of a

24  continuing relationship to extract confidential information regarding PeopleBrowsr's innovations

25  and business prospects.

26        102.    **August 2011 Meeting.** On August 1, 2011, Twitter's Erica Anderson invited

27  PeopleBrowsr "to present PeopleBrowsr's product suite to our [business development] team. We

28  agree it's certainly the right time to do this and to renew a conversation about our partnership

-29-

1   moving forward." That meeting was held on August 11, 2011. At the meeting, Mr. Rich gave a

2   full product demonstration to approximately twelve Twitter employees responsible for business

3   development and product development. These employees included not only persons responsible

4   for working with third-party developers, but Twitter employees tasked with developing Twitter's

5   own business leads. Mr. Rich discussed PeopleBrowsr's business plans and strategy with

6   Twitter. After the meeting, Twitter asked for PeopleBrowsr's customer list, which PeopleBrowsr

7   provided.

8          103.    Among the products Mr. Rich presented at the August 11, 2011 meeting was

9   PeopleBrowsr's TV Analytics program. Twitter showed great interest in this product. About a

10  week after the presentation, Ms. Anderson contacted Mr. Rich, requesting user accounts for the

11  TV Analytics program so that Twitter could try it out. PeopleBrowsr provided these accounts.

12         104.    **October 2011 Meeting.** In October 2011, Twitter again sought PeopleBrowsr's

13  confidential business information, requesting that PeopleBrowsr provide its six-month business

14  plan, including customers and prospects. On October 21, 2011, Mr. Rich met with Twitter's

15  Doug Williams at PeopleBrowsr's headquarters. Williams told Mr. Rich that Twitter would be

16  deciding on an "inner sanctum" of partners who would receive Firehose access over the next six

17  months, and Williams and Mr. Rich discussed opportunities for PeopleBrowsr to work more

18  closely with Twitter. Mr. Rich provided a demonstration of PeopleBrowsr's Kred product, and

19  told Williams about PeopleBrowsr's candidacy for a $3 million Department of Defense contract.

20         105.    At that meeting, Williams authorized certain PeopleBrowsr products that did not

21  compete with Twitter, while indicating that products that would compete with Twitter or its

22  partners were not acceptable. Williams told Mr. Rich that PeopleBrowsr could not offer TV

23  analytics because Twitter had selected a partner, Blue Fin, that would provide that service

24  exclusively. Williams also told PeopleBrowsr not to offer services through its API that Twitter

25  could provide. However, Williams told Mr. Rich that Twitter was comfortable with

26  PeopleBrowsr providing its Kred service because Twitter did not plan to have a competing

27  service in the next two years.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

106.   **November 2011 Meeting.**  A week later, Williams followed up by email, asking for an additional meeting to "review PeopleBrowsr's current feature set and focus with [Twitter Head of Platform] Ryan [Sarver] and myself."  Williams stated that PeopleBrowsr's "broad license is of a dying breed," and that Twitter wanted tighter control over Firehose partners.  He suggested that they meet in order to "define the product PeopleBrowsr wants to have in the market and how that represents a strategic win for the partnership."

107.   That meeting was held on November 23, 2011.  Mr. Rich, Andrew Grill, PeopleBrowsr's UK CEO, and Scott Milener, PeopleBrowsr's Senior VP of Business Development and Social Strategy, met with Twitter staff including Doug Williams and Ryan Sarver at Twitter's headquarters.  At this meeting, Twitter reiterated its opposition to PeopleBrowsr's providing services that competed with Twitter in the consumer application market.  It again stated that PeopleBrowsr could not provide TV analytics, because Twitter had decided to only allow a single partner to compete in that market.  It then went further, telling PeopleBrowsr that several of its new initiatives could not go forward.  Twitter prohibited PeopleBrowsr's planned partnership with the Mass Relevance social integration platform and forbade PeopleBrowsr from re-syndicating tweets.  Doug Williams stated that Twitter desired to focus on selected "special partners," while Sarver indicated that PeopleBrowsr no longer "fit the profile" of a Firehose partner – a closely controlled company that directly benefitted Twitter's business development efforts.  Williams stated that if the company's relationship was to continue, Twitter would have to have a "closer relationship" in which Twitter told PeopleBrowsr where to focus its efforts.  Twitter also stated that it was developing its own data analytics capability.

108.   During this November 23, 2011 meeting, Mr. Rich reiterated the importance of the full Firehose to PeopleBrowsr's products.  He also reminded Doug Williams and Mr. Sarver that PeopleBrowsr was a candidate for a multi-million dollar contract with the U.S. Department of Defense that depended upon access to the full Firehose feed.

109.   **January 2012 Meeting.**  On January 30, 2012, Mr. Rich met again with Doug Williams.  Mr. Rich told Williams that PeopleBrowsr had closed its deal with the Department of Defense for $3 million.  He updated Williams on PeopleBrowsr's business prospects and plans

-31-

1 and responded to Williams' questions about PeopleBrowsr's technology. Williams made no

2 indication that PeopleBrowsr's Firehose access would be terminated, but stated "we will work it

3 out."

4       110. **February 2012 Accounting of Key Customers.** In February 2012, again at

5 Twitter's request, Mr. Rich sent a detailed accounting of its 30 key "strategic" customers to Doug

6 Williams of Twitter.

7       111. **May 2012 Renewal Proposal and Meeting.** The next month, Twitter stated that

8 it needed to re-negotiate the terms of PeopleBrowsr's Firehose access so that Twitter would have

9 greater control over PeopleBrowsr's business. On March 19, 2012, Doug Williams requested that

10 PeopleBrowsr provide a formal renewal proposal for its Firehose access, stating that Twitter now

11 only agreed to Firehose access as part of "pre-negotiated product integrations under standard

12 business terms to ensure we remain aligned through the course of the Term." He stated he would

13 use the formal proposal to "first give you feedback on the fit with current strategic priorities then

14 gather internal feedback on the opportunity for renewal." As part of this proposal, Williams

15 requested that PeopleBrowsr discuss its key accounts.

16       112. Williams followed up on April 5, 2012, again reiterating Twitter's desire to only

17 provide Firehose access to companies it could tightly control: "[W]e're extremely focused on

18 limiting the number and focus of our Firehose relationships to very tight, very strategic products

19 so specificity and strategic alignment is highly encouraged."

20       113. On May 10, 2012, Mr. Rich made a presentation to Doug Williams and Jana

21 Messerschmidt, a Senior Director of Business Development at Twitter, in which he described

22 PeopleBrowsr's innovations, products, and services. Again, at Twitter's request, Mr. Rich

23 described PeopleBrowsr's agreements with approximately nine clients and identified thirty-four

24 of PeopleBrowsr's API customers, and provided a revenue forecast. Mr. Rich described several

25 of PeopleBrowsr's emerging innovative products and custom software based on its data mine of

26 tweets from the Firehose. Mr. Rich reiterated that all of its products and services depend on

27 access to Twitter's full Firehose.

28

1    114.   **May 24, 2012 Direction to Transition from Firehose.**  After this meeting, on

2    May 24 2012, Doug Williams advised Mr. Rich that PeopleBrowsr should plan to transition off

3    the full Firehose feed and suggested that PeopleBrowsr seek access to a portion of the Firehose

4    data through Gnip or DataSift.  Doug Williams' only stated reason for Twitter's intended

5    termination of PeopleBrowsr was that PeopleBrowsr was no longer a strategic "fit" for Twitter.

6    115.   While PeopleBrowsr has consistently committed to remain a good partner to

7    Twitter, it has also consistently refused to have the shape and direction of its business dictated by

8    Twitter.  Instead, PeopleBrowsr has insisted on finding innovative uses for Twitter data, letting

9    the market determine whether its products succeed.  This – rather than having Twitter dictate

10   what products PeopleBrowsr provides – is the best way to create innovative and useful products

11   for consumers, to build PeopleBrowsr's business, and ultimately to help Twitter have the most

12   useful impact.  For example, when Twitter informed Mr. Rich on October 21, 2011, that it

13   intended to have its partner Blue Fin provide TV analytics exclusively and did not want

14   PeopleBrowsr to compete with that partner,  Mr. Rich continued to argue that having more than

15   one service was better for the market.  Twitter responded that it preferred to limit participants in a

16   market to a few "special relationships" so that it could work closely with and control those

17   participants.  Similarly, when Twitter insisted on limiting the number of partners that could

18   resyndicate tweets (i.e., provide Twitter data to third parties), PeopleBrowsr complied, but in Mr.

19   Rich's November 2011 and May 2012 meetings with Twitter, he argued that having more

20   providers would be good for Twitter.  Again, Twitter stated it wanted to limit resyndication to its

21   "preferred partners," Gnip and DataSift.

22   116.   Doug Williams acknowledged in the May 2012 meeting that Twitter's termination

23   of PeopleBrowsr would result in the loss of a critical source of data for PeopleBrowsr, and would

24   make it impossible for PeopleBrowsr to continue to provide the products and services it was

25   contractually obligated to deliver.  Doug Williams further acknowledged that the termination

26   could put PeopleBrowsr out of business entirely.  Despite these consequences, Doug Williams

27   maintained his direction that Mr. Rich plan PeopleBrowsr's transition off of the full Firehose

28   feed.

117.   **June 2012 Letter.**  Faced with catastrophic injury to its business if Firehose access were removed, PeopleBrowsr sent Twitter a letter on June 1, 2012, attempting to convince Twitter to reconsider, given that Twitter's decision would cause dire business consequences and violate PeopleBrowsr's legal rights.

118.   Subsequently, Twitter indicated that it had reconsidered.  In a June 30, 2012 email, Mr. Rich conceded a billing dispute with Twitter on the basis that it would become irrelevant as the companies' Firehose agreement continued.  Twitter responded by saying the two companies "are once again aligned."

119.   **July 25, 2012 Termination Email.**  In a July 25, 2012 email, Ms. Messerschmidt stated that Twitter intended to terminate PeopleBrowsr's Firehose access in 90 days.  The email stated that Twitter was "no longer in a position to continue to support PeopleBrowsr's current month-to-month Firehose license," but provided no further explanation and no discussion of the costs to Twitter to continue PeopleBrowsr's access.  Ms. Messerschmidt's email also expressed Twitter's desire to move PeopleBrowsr to a new "standard for elevated data access," stating that "Twitter has publicly moved away from direct legacy Firehose licenses and created channel resyndication partnerships with Gnip and DataSift to address broad commercial demand in a consistent and transparent manner."  The email did not acknowledge, however, that Gnip and DataSift cannot provide access to all of Twitter's data, nor that Twitter continues to provide full Firehose access to its "Twitter-driven" partners on terms that are not publicly available.

**D.     Twitter Has Refused to Provide Any Substantive Rationale For Termination.**

120.   Twitter has refused to provide any valid business justification – or any substantive explanation whatsoever – for its decision to terminate, despite repeated efforts by PeopleBrowsr to seek information and work out a mutually agreeable solution to the dispute:

- On July 25, 2012, Dana Messerschmidt emailed PeopleBrowsr, giving official notice of Twitter's desire to terminate PeopleBrowsr's Firehose access in 90 days.
- On July 31, 2012, Mr. Rich responded to Ms. Messerschmidt's email, stating that Gnip and DataSift could not provide the data access necessary to support

1          PeopleBrowsr's business, and seeking clarification regarding the business

2          justifications for Twitter's threatened action.

3       •   Twitter refused to answer any of my questions, but did agree to a "cooling off"

4          period for the parties to seek mediation.  The parties ultimately agreed to hold a

5          mediation on November 6, 2012, and Twitter stated it would terminate Firehose

6          access on November 30, 2012, if no agreement is reached at the mediation.

7       •   On August 10, 2012, Mr. Rich emailed Doug Williams of Twitter, providing a

8          detailed explanation for why the Firehose is essential to PeopleBrowsr's business.

9          Mr. Williams did not respond.

10      •   On August 21, 2012, in order to comply in good faith with Twitter's requests,

11         PeopleBrowsr held a teleconference with DataSift to discuss its data options.

12         DataSift stated that it had access to the full Firehose feed, but could only provide it

13         to PeopleBrowsr with Twitter's written permission.  Mr. Rich asked that DataSift

14         seek such permission.

15      •   On August 28, 2012, DataSift followed up by email, stating that full Firehose

16         access is unavailable.  The only options for data access are (a) receiving a random

17         10% of Twitter's data; or (b) receiving data that matches a limited number of

18         specific search terms, which necessarily would not be complete.

19      •   The same day, PeopleBrowsr held a teleconference with Gnip to discuss data

20         options.  Gnip stated that full Firehose access was not available because it was not

21         authorized by Twitter.  Gnip at best could provide some portion of the Firehose at

22         twice the cost of the full Firehose under PeopleBrowsr's current agreement.

23     121.    Twitter and PeopleBrowsr have engaged in mediation and further negotiations.

24  Despite these efforts, Twitter intends to terminate PeopleBrowsr's Firehose access on November

25  30, 2012.

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

### E.     Twitter's Termination of PeopleBrowsr's Firehose Access Would Irreparably Harm PeopleBrowsr And Harm Competition.

122.    Twitter's termination of PeopleBrowsr's access to the Firehose would devastate PeopleBrowsr's business, causing irreparable injury that could not be remedied with any amount of monetary damages.  For the reasons discussed in Section B.6, PeopleBrowsr must have access to the Firehose to provide the services its web users and contracting partners expect.  Without the Firehose, PeopleBrowsr will not be able to meet its contractual obligations to its customers, obtain any new customers, or achieve its potential in the growing market for Twitter Big Data Analytics.

123.    Loss of Firehose access will devastate PeopleBrowsr's business and cause irreparable damage to its goodwill and business relations.  PeopleBrowsr's business is built on long partnerships with its clients that require substantial investment by PeopleBrowsr.  Without the Firehose, PeopleBrowsr cannot provide its contracting partners with the services they contracted for.  An inability to deliver on PeopleBrowsr's existing contracts would cause PeopleBrowsr to lose its investments in those relationships.  It would also prevent PeopleBrowsr from entering into deals with new clients.  Further, it would undermine PeopleBrowsr's projections and roadmaps, which are key to its ability to obtain capital, find new clients, and enjoy continued success.

124.    Twitter's suggested alternatives to the Firehose are not adequate.  Twitter has suggested that PeopleBrowsr seek access to Twitter data through Gnip or DataSift, which cannot provide all of Twitter's data without authorization from Twitter.  Upon learning that full access was theoretically available with Twitter's approval, PeopleBrowsr sought such approval.  Twitter refused to provide access to all of its data.  Twitter has suggested that PeopleBrowsr could provide the same services by sampling Twitter's data, and has referred in negotiations to "data analytics" providers, in the broadest sense, that do business without the Firehose.  But these companies do not provide the type of sophisticated, Twitter Big Data Analytics that PeopleBrowsr and a handful of competitors provide.  They are not in the same market as PeopleBrowsr.  Moreover, Gnip and DataSift's terms of use prohibit uses of Twitter data that are

1    essential to PeopleBrowsr's offerings, such as displaying tweets. Gnip and DataSift are not a

2    viable alternative to the Firehose.

3         125.    Cutting off access to the Firehose will interfere with PeopleBrowsr's contracts and

4    business relations with third parties. As Twitter well knows, having frequently requested reports

5    on PeopleBrowsr's business prospects, PeopleBrowsr has valid contracts with third parties,

6    including, but not limited to: (1) a three-year contract with the U.S. Department of Defense,

7    through a defense contractor, STR, worth approximately $3 million, (2) a long term contract with

8    Cadalys to build a customized Kred application, worth approximately $400,000, (3) a long term

9    contract with Radian6 to incorporate Kred into its products, worth approximately $300,000, (4) a

10    long term contract with Badgeville to incorporate Kred into its products, worth approximately

11    $400,000, (5) a contract with Mashable to power its mRank product through PeopleBrowsr's API,

12    and (6) a contract for at least one year with DynamicLogic, worth at least $75,000. PeopleBrowsr

13    will not be able to fulfill its obligations under these contracts if it does not have access to the

14    Firehose and cannot perform the analyses its customers seek. Nor will it be able to consummate

15    prospective business relations with other parties, including the Dell Computer, Demand Media,

16    Ogilvy, Bell-Pottinger, and CBS Interactive.

17         126.    Cutting off the Firehose will also harm competition. Eliminating PeopleBrowsr

18    will eliminate the sole or one of two providers of three types of Twitter Big Data Analytics

19    services: (a) Influence Measurement (which identifies people able to influence others within

20    particular communities and generally); (b) Action Analytics for Government and Enterprise

21    (which spots trends in reaction to a brand); and (c) Financial Data Services (which allows

22    financial services to detect market changes earlier). PeopleBrowsr is one of two viable providers

23    of Influence Measurement. It is the sole provider of Action Analytics for Government and

24    Enterprise. Along with Dataminr, a Twitter partner with full Firehose access, it is the only

25    provider of Financial Data Services. DataSift, another close Twitter partner, is also attempting to

26    develop capabilities to serve this market. Removing PeopleBrowsr as a participant in these

27    markets will significantly limit consumer choice.

28

1    127.    Twitter has no legitimate or reasonable business purpose for its planned

2    termination of PeopleBrowsr, which is unfair and anticompetitive.  Twitter's stated rationale for

3    taking control of consumer markets – the asserted need to ensure a "uniform Twitter experience"

4    – has no application to PeopleBrowsr, which does not provide consumers with the core Twitter

5    experience (e.g., allowing them to post tweets).  Whatever business justifications Twitter may

6    offer for denying Firehose access to other data analytics providers, they ring hollow in reference

7    to PeopleBrowsr, a valuable partner with a four-year track record of growth and benefit to

8    Twitter.  PeopleBrowsr has not breached its agreement with Twitter, and Twitter's planned

9    termination of PeopleBrowsr will cause Twitter to forego over $1 million a year in payments.

10   Though Twitter has made vague allusions to the cost of providing PeopleBrowsr's access, it has

11   refused to identify those costs, which likely are dwarfed by the revenues received by Twitter

12   under the parties agreement.

13   128.    Twitter seeks to terminate PeopleBrowsr's Firehose access in order to eliminate

14   PeopleBrowsr as a competitor and take PeopleBrowsr's business opportunities.  Twitter's

15   termination of PeopleBrowsr is an unreasonable and anticompetitive exercise of Twitter's power

16   over data to allow it to dominate the Twitter Big Data Analytics market.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

129.    PeopleBrowsr incorporates herein by reference, and alleges as though set forth in

full, the allegations contained in Paragraphs 1-128.

130.    PeopleBrowsr has entered into the following valid contracts: (1) a three-year

contract with the U.S. Department of Defense, through a defense contractor, STR, worth

approximately $3 million, (2) a long term contract with Cadalys to build a customized Kred

application, worth approximately $400,000, (3) a long term contract with Radian6 to incorporate

Kred into its products, worth approximately $300,000, (4) a long term contract with Badgeville to

incorporate Kred into its products, worth approximately $400,000, (5) a contract with Mashable

1  to power its mRank product through PeopleBrowsr's API, and (6) a contract for at least one year

2  with DynamicLogic, worth at least $75,000.

3      131.   Twitter knows of these contracts.  Twitter requested and PeopleBrowsr provided

4  detailed information about its contracts with third parties.  For example, PeopleBrowsr has

5  provided Twitter with its monthly sales reports since July 2010.  In February 2012,

6  PeopleBrowsr's CEO, Jodee Rich, sent a detailed accounting of its 30 key "strategic" customers

7  to Doug Williams of Twitter.  PeopleBrowsr's May 2012 presentation to Doug Williams and Jana

8  Messerschmidt described the details of its contracts with STR, Cadalys, Radian6, Badgeville,

9  Mashable, and DynamicLogic.

10     132.   Twitter intends to disrupt PeopleBrowsr's performance of these contracts.  Twitter

11  understands that its intentional decision to suspend PeopleBrowsr's access to the full Firehose

12  would disrupt PeopleBrowsr's relationship with its third party customers, rendering

13  PeopleBrowsr unable to perform under its contracts.  Twitter intends to terminate PeopleBrowsr's

14  access to the Firehose and knows that this termination is substantially certain to disrupt

15  PeopleBrowsr's ability to perform its obligations under these contracts.  PeopleBrowsr has

16  informed Twitter on at least seven occasions that the Firehose is essential to its business.

17     133.   Twitter's termination of access to the Firehose would disrupt PeopleBrowsr's

18  relationship with its third party customers, making PeopleBrowsr's performance more difficult,

19  more expensive, and potentially wholly preventing PeopleBrowsr from performing these

20  contracts.  Without the ability to perform under its contracts or provide its services to clients,

21  PeopleBrowsr irreparable injury to its business, its goodwill, and its business relationships.

22  PeopleBrowsr seeks a preliminary and permanent injunction to prevent this irreparable injury.

23     134.   In addition, if Twitter is allowed to go through with the termination, PeopleBrowsr

24  will be harmed by the loss of revenue under the contracts.  Twitter's termination of

25  PeopleBrowsr's access to the Firehose will be a substantial factor in causing PeopleBrowsr's loss

26  of revenue.

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-39-

135.     As a direct and proximate result of Twitter's termination of PeopleBrowsr's access to the Firehose, and in addition to the irreparable injury of going out of business, PeopleBrowsr will be damaged by the loss of revenue under its contracts in an amount to be proven at trial.

### SECOND CAUSE OF ACTION: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

136.     PeopleBrowsr incorporates herein by reference, and alleges as though set forth in full, the allegations contained in Paragraphs 1-135.

137.     PeopleBrowsr has prospective business relationships with Dell Computer, Demand Media, Ogilvy, Bell-Pottinger, and CBS Interactive and others.

138.     Twitter knows of these relationships with prospective clients as a result of communications with PeopleBrowsr's CEO, Mr. Rich.  In February 2012, Mr. Rich sent Doug Williams of Twitter a detailed list of ten prospective customers relationships that it expected to formalize in the near future.  Also, on May 10, 2012, Mr. Rich met with Twitter representatives, including Doug Williams and Jana Messerschmidt, at Twitter's San Francisco offices to discuss PeopleBrowsr's business and products.  During this meeting, Mr. Rich specifically identified PeopleBrowsr's customers and described the products and services each customer receives from PeopleBrowsr.  Through these communications and others Twitter is aware of PeopleBrowsr's prospective business relationships with Dell Computer, Demand Media, Ogilvy, Bell-Pottinger, and CBS Interactive.

139.     Twitter intends to disrupt PeopleBrowsr's relationship with these potential clients.  Twitter understands that its intentional decision to suspend PeopleBrowsr's access to the full Firehose would disrupt PeopleBrowsr's relationship with its potential clients, because PeopleBrowsr's products and services rely on full access to the Firehose.  Twitter intends to terminate PeopleBrowsr's access to the Firehose and knows that this termination is substantially certain to disrupt PeopleBrowsr's economic relationship with its potential clients.

140.     By terminating PeopleBrowsr's Firehose access, Twitter would engage in wrongful conduct.  Twitter represented to PeopleBrowsr and the public for many years that it would: (a) maintain an open ecosystem, (b) accept competitors' efforts to monetize Twitter data,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

1    and (c) refrain from taking or shutting down those competitors' products. PeopleBrowsr

2    reasonably relied on Twitter's repeated representations, which are consistent with the inherently

3    open and public nature of tweets. Twitter's planned termination of PeopleBrowsr's access to the

4    Firehose proves these representations to be false. Twitter's threatened termination closes its

5    ecosystem to PeopleBrowsr, and shows that Twitter does not accept PeopleBrowsr's efforts to

6    monetize Twitter data. Instead, Twitter is terminating PeopleBrowsr's Firehose access to

7    eliminate PeopleBrowsr and its products and services to clear the way for Twitter and/or its

8    partners to sell data analytics products. In addition, Twitter's threatened action is anticompetitive

9    in violation of the Unfair Competition Law, Business and Professions Code Section 17200, *et*

10   *seq.*

11          141.    Twitter's threatened termination of PeopleBrowsr's Firehose access will disrupt

12   PeopleBrowsr's relationship with its prospective clients. PeopleBrowsr will not be able to

13   conclude or finalize expected contracts or orders with potential customers because its products

14   will not function as designed without the full Firehose feed. Without the ability to perform under

15   its contracts or provide its services to prospective clients, PeopleBrowsr will suffer irreparable

16   injury to its business, goodwill, and business relationships, that cannot be compensated by any

17   amount of damages. PeopleBrowsr seeks a preliminary and permanent injunction to prevent this

18   irreparable injury.

19          142.    In addition, if Twitter is allowed to go through with the termination, PeopleBrowsr

20   will be harmed by the loss of revenue expected from its economic relationships with its potential

21   customers. Twitter's termination of PeopleBrowsr's access to the Firehose will be a substantial

22   factor in causing PeopleBrowsr's loss of revenue.

23          143.    As a direct and proximate result of Twitter's termination of PeopleBrowsr's access

24   to the Firehose, and in addition to the irreparable injury to PeopleBrowsr's ability, PeopleBrowsr

25   will be damaged by the loss of revenue under prospective contracts in an amount to be proven at

26   trial.

27

28

**THIRD CAUSE OF ACTION:  PROMISSORY ESTOPPEL**

144.    PeopleBrowsr incorporates herein by reference, and alleges as though set forth in full, the allegations contained in Paragraphs 1-143.

145.    Twitter represented to PeopleBrowsr and the developer community at large that it would maintain an open ecosystem in which developers would have open access to Twitter data and could monetize Twitter data in competition with Twitter and that Twitter would not act to undermine their ability to compete.

146.    Twitter made these representations publicly on several occasions, as alleged above.  For example, on January 18, 2008, Twitter explained on its blog that "[O]ur open approach is more than just good karma.  Twitter, Inc. is committed to building a reliable social messaging utility which people trust enough to use every day.  Gaining trust means showing our work.  When a technology is shared, conversations and understanding form around it."  On March 1, 2010, Twitter stated that "[e]ven before Twitter was officially a company, we opened our technology in ways that invited developers to extend the service."  Twitter's Rules of the Road for Developers state, "Twitter maintains an open platform that supports the millions of people around the world who are sharing and discovering what's happening now.  We want to empower our ecosystem partners to build valuable businesses around the information flowing through Twitter."

147.    Twitter reinforced its commitment to an "open" ecosystem in its direct communications with PeopleBrowsr's CEO.  For example, on July 13, 2009, Alex Payne, a senior employee at Twitter told Mr. Rich that Doug Williams, Ryan Saver, and he were "all fighting to keep access to the Firehose and other APIs as open as possible.  We're on the same page as you."

148.    In reliance on those assurances, PeopleBrowsr invested over $5 million and over 30,000 hours to develop its programs and services designed to capitalize on the company's full feed of data.

149.    In addition, in reliance on Twitter's assurances, PeopleBrowsr provided confidential and proprietary business information to Twitter in an effort to foster their relationship.  Twitter requested and PeopleBrowsr provided lists of its top clients and its best

1    prospective clients.  Twitter requested and PeopleBrowsr shared detailed, non-public information

2    about its products, including explanations of its unique approach to analyzing Twitter data.

3    PeopleBrowsr shared this proprietary data with Twitter with the expectation that the companies

4    would continue their licensing agreement.

5          150.    PeopleBrowsr's reliance on these promises and assurances was reasonable and

6    foreseeable.  While it was developing its products and services, Twitter relied on third-party

7    developers to create thousands of applications that improved its product offering.  Twitter

8    repeatedly assured PeopleBrowsr and others in the developer community, that it was safe to

9    innovate based on Twitter—Twitter represented that it would keep its ecosystem "open" and

10   would not cut off developers' Twitter data access in order to take their products or clients or

11   undermine their ability to compete.  PeopleBrowsr reasonably believed these assurances because

12   such an open ecosystem is a common and successful internet model, and also matched with

13   Twitter's business model, stated philosophy and the inherently open and public nature of its

14   platform.

15         151.    Twitter's termination of PeopleBrowsr's access to the Firehose would harm

16   PeopleBrowsr.  PeopleBrowsr would lose its current clients and its business would be devastated

17   if Twitter terminated PeopleBrowsr's access to the Firehose.  Enforcing Twitter's promise to

18   maintain an open ecosystem will avoid injustice.

19
20              **FOURTH CAUSE OF ACTION:  VIOLATIONS OF BUSINESS &**
                        **PROFESSIONS CODE § 17200**

21         152.    PeopleBrowsr incorporates herein by reference, and alleges as though set forth in

22   full, the allegations contained in Paragraphs 1-151.

23         153.    Twitter has violated California's Unfair Competition Law, Business and

24   Professions Code § 17200 et seq. (the "UCL"), by committing acts of unfair competition.

25         154.    Twitter has committed unlawful acts through its intentional interference with

26   PeopleBrowsr's existing contracts and prospective business relations.  Eliminating Firehose

27   access will interfere with PeopleBrowsr's existing contracts and prospective business relations, in

28   violation of California common law.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; CASE NO.
SFACTIVE-902895362.1

155.   Twitter has also violated the UCL by committing acts of unfair competition that significantly threaten or harm competition.  Twitter is the dominant player in the market for real-time, public micro-blog data in the United States, including the mass sale of that data for purposes of analysis.  Twitter has exclusive control over access to its data.

156.   PeopleBrowsr participates in the "Twitter Big Data Analytics market," in which a small number of highly sophisticated businesses analyze very high amounts of Twitter data to provide high quality, in-depth analytics.  This market is distinct from the market for data analytics performed using lower levels or samples of Twitter data.  The highest levels of access to Twitter data are a unique and essential input for companies in the Twitter Big Data Analytics market.

157.   Twitter is using its exclusive control over its data to gain control of the Twitter Big Data Analytics market.  Twitter threatens to cut off PeopleBrowsr's Firehose access, limiting PeopleBrowsr's data access to a fraction of its current volume.  By restricting competitors' access to its data, while reserving full and unfettered access to that data for itself and its closely controlled partners, Twitter threatens to harm competition in the Twitter Big Data Analytics market.  In addition, Twitter has used its exclusive control over its data to extract valuable and sensitive business information, including technical data and customer lists, from PeopleBrowsr.  Twitter has repeatedly required PeopleBrowsr to provide such data in order to justify its continued access to the Firehose.  Twitter has also used its exclusive control over its data to restrict PeopleBrowsr's ability to compete with Twitter in other markets that Twitter considers valuable by dictating the products and services that PeopleBrowsr is allowed to offer.

158.   Twitter's actions are unreasonable and anticompetitive.  Twitter currently enjoys a profitable contract with PeopleBrowsr, under which it now receives more than $1 million per year for PeopleBrowsr's Firehose access, and it is against its short-term financial interest to forego the benefits of this contract.  PeopleBrowsr has not breached the terms of its agreement with Twitter, and Twitter has no valid business justification for terminating that agreement.

159.   By terminating PeopleBrowsr's Firehose access, Twitter will eliminate the sole provider or one of two providers of three Twitter Big Data Analytics services: (a) Influence Measurement, where PeopleBrowsr's Kred product provides a unique visual stream that allows

-44-

1  consumers to identify others with like interests, as well as those who are influential in those

2  communities; (b) Action Analytics for Government and Enterprise, which tracks all activity

3  related to a brand or particular markets in order to identify trends; and (c) Financial Data

4  Services, which spots trends in Twitter data in order to more quickly detect when market changes

5  are occurring.  PeopleBrowsr is one of two viable providers of Influence Measurement.  It is the

6  sole provider of Action Analytics for Government and Enterprise.  PeopleBrowsr and Dataminr, a

7  close Twitter partner with Firehose access, are the only Financial Data Services providers.

8  DataSift, another close Twitter partner, also intends to offer Financial Data Services.

9       160.    As a direct and proximate result of Twitter's acts of unfair competition,

10  competition in the market for analysis of Twitter data would be harmed.  Customers would lose

11  access to PeopleBrowsr's unique products and services, PeopleBrowsr would be eliminated as a

12  competitor, innovation in markets utilizing Twitter data would be diminished, and Twitter would

13  gain greater market power in markets using Twitter data, allowing it to dictate terms and limit

14  consumer options.

15       161.    PeopleBrowsr seeks a preliminary and permanent injunction to prevent Twitter

16  from interfering with PeopleBrowsr's contracts and prospective business relationships, and from

17  eliminating PeopleBrowsr as a competitor through its acts of unfair competition, including its

18  unfair termination of PeopleBrowsr's access to the Firehose.

19                                **PRAYER FOR RELIEF**

20       WHEREFORE, PeopleBrowsr prays for judgment as follows:

21       1.     As to all causes of action, a permanent injunction to prevent Twitter from

22  terminating or suspending PeopleBrowsr's access to Twitter's full Firehose data feed.

23       2.     As to the first, second, and third causes of action against Twitter, money damages

24  in an amount to be proven at trial.

25       3.     As to the fourth cause of action, restitution of all amounts PeopleBrowsr paid to

26  Twitter.

27       4.     As to all causes of action, costs of suit herein incurred; and

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1      5.      As to all causes of action, such other and further relief as the Court may deem

2   proper.

3   Dated:  November 27, 2012                        CROWELL & MORING LLP

4

5                                                    Michael Kahn
                                                     Gregory D. Call
6                                                    Beatrice B. Nguyen
                                                     Attorneys for Plaintiffs
7                                                    PeopleBrowsr, Pty., Ltd. and
                                                     PeopleBrowsr, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28