1   DURIE TANGRI LLP
    MICHAEL H. PAGE (SBN 154913)
2   mpage@durietangri.com
    JOSHUA H. LERNER (SBN 220755)
3   jlerner@durietangri.com
    217 Leidesdorff Street
4   San Francisco, CA 94111
    Telephone:   415-362-6666
5   Facsimile:   415-236-6300

6   WILSON SONSINI GOODRICH & ROSATI, P.C.
    JONATHAN M. JACOBSON (*admitted to N.D. Cal., but not CA state bar*)
7   jjacobson@wsgr.com
    1301 Avenue of the Americas, 40th Floor
8   New York, NY 10019
    Telephone:   212-497-7758
9   Facsimile:   212-999-5899

10  WILSON SONSINI GOODRICH & ROSATI, P.C.
    SCOTT A. SHER (SBN 190053)
11  ssher@wsgr.com
    1700 K St., NW, Fifth Floor
12  Washington, DC 20006
    Telephone:   202-973-8822
13  Facsimile:       202-973-8899

14  Attorneys for Defendant
    Twitter, Inc.

15                  IN THE UNITED STATES DISTRICT COURT

16              FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18  PeopleBrowsr, Inc., and PeopleBrowsr Pty., Ltd.,     Case No. 4:12-cv-06120-EMC

19                              Plaintiffs,              **DEFENDANT TWITTER, INC.'S NOTICE OF
                                                         MOTION AND MOTION TO DISMISS
20                                                       PLAINTIFFS' COMPLAINT**

21          v.
                                                         Date:     January 31, 2013
22  Twitter, Inc.,                                       Time:     1:30 p.m.
                                                          Ctrm:    5 - 17th Floor
23                              Defendant.               Judge:   Honorable Edward M. Chen

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on January 31, 2013, at 1:30 p.m. in Courtroom 5 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Twitter, Inc. ("Twitter" or "Defendant") by its attorneys Durie Tangri LLP and Wilson Sonsini Goodrich & Rosati, P.C., will move and hereby moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiffs PeopleBrowsr, Inc. and PeopleBrowsr Pty., Ltd.'s (collectively "PeopleBrwsr" or "Plaintiffs") Complaint against Twitter with prejudice.

This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities in support thereof, the Request for Judicial Notice filed herewith, the Complaint and other pleadings on file in this matter, the arguments of counsel, and all other material which may properly come before the Court at or before the hearing on this Motion.

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL SUMMARY .......................................................................................3

    A.    The Parties Negotiated A Contract That Gave Both Parties The Right To
           Terminate Without Cause. ..........................................................................3

    B.    Twitter Decided Not To Renew The Agreement ..................................................4

III.   ARGUMENT ........................................................................................................5

    A.    PeopleBrowsr's Promissory Estoppel Claim Is Barred By The Parties' Written
           Contract ..........................................................................................5

           1.    There Is a Written, Integrated Contract Between the Parties..................5

           2.    The Written Contract Bars PeopleBrowsr's Claims of Contrary "Promises" .........6

    B.    PeopleBrowsr's Interference Claims Are Barred By Privilege ...........................7

    C.    PeopleBrowsr's Section 17200 Claims Fail ......................................................9

           1.    Legal Standard .........................................................................9

           2.    Twitter Has the Right to Control Its Data.........................................11

           3.    Plaintiffs Allege No Unlawful or Unfair Act Under the Cartwright Act..............12

           4.    Plaintiffs Allege No Unlawful or Unfair Act Under the Sherman Act.................13

IV.    CONCLUSION....................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Altera v. Clear Logic, Inc.,*
424 F.3d 1079 (2005)................................................................................................6

*Apple, Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................................15

*Aquino v. Credit Control Servs.,*
4 F. Supp. 2d 927 (N.D. Cal. 1998) ........................................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)................................................................................................17

*Atl. Richfield Co. v. USA Petroleum, Co.,*
495 U.S. 328 (1990)................................................................................................13

*Banco Do Brasil, S.A. v. Latian, Inc.,*
234 Cal. App. 3d 973 (1991) ................................................................................6, 7

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
725 F.2d 300 (5th Cir. 1984) ..................................................................................14

*BMW of N. Am., Inc. v. New Motor Vehicle Bd.,*
162 Cal. App. 3d 980 (1984) ....................................................................................6

*Bridge v. E*Trade Sec. LLC,*
No. C-11-2521 EMC, 2011 WL 5444266 (N.D. Cal. Nov. 9, 2011)........................7

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.,*
971 F.2d 272 (9th Cir. 1992) ....................................................................................6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)............................................................................................13, 14

*Brutto v. Chin,*
No. B194350, 2008 WL 2191772 (May 28, 2008)....................................................7

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (1999) ............................................................................................10

*Chaganti v. I2 Phone Int'l, Inc.,*
313 F. App'x 54 (9th Cir. 2009) ..............................................................................8

*Chavez v. Whirlpool Corp.,*
93 Cal. App. 4th 363 (2001) ....................................................................................11

*Christy Sports, LLC v. Deer Valley Resort Co.,*
555 F.3d 1188 (10th Cir. 2009) ..............................................................................17

*Churchill Vill., L.L.C. v. Gen. Elec. Co.,*
169 F. Supp. 2d 1119 (N.D. Cal. 2000) ..................................................................10

iii

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
   36 F.3d 1147 (1st Cir. 1994) ......................................................................................... 17

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) ..................................................................................................... 8

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986),
   *modified*, 810 F.2d 1517 (9th Cir. 1987) ....................................................................... 13

*Elliott v. United Ctr.*,
   126 F.3d 1003 (7th Cir. 1997) ....................................................................................... 15

*Enrico Farms, Inc. v. H.J. Heinz Co.*,
   629 F.2d 1304 (9th Cir. 1980) ......................................................................................... 6

*Facebook, Inc. v. Power Ventures, Inc.*,
   Case No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) .................. 12, 16

*Freed v. Manchester Serv., Inc.*,
   165 Cal. App. 2d 186 (1958) ........................................................................................... 7

*IGT v. Alliance Gaming Corp., et al.*,
   --- F.3d ----, 2012 WL 6554712 (Fed. Cir. Dec. 17, 2012) ........................................... 14

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) .................................................................................. 12

*M.A.P. Oil Co. v. Texaco, Inc.*,
   691 F.2d 1303 (9th Cir. 1982) ....................................................................................... 14

*Masterson v. Sine*,
   68 Cal. 2d 222 (1968) ...................................................................................................... 6

*Mayes v. Sturdy N. Sales*,
   91 Cal. App. 3d 69 (1979) ............................................................................................... 7

*Newcal Industries, Inc. v. IKON Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ....................................................................................... 15

*Nicsand, Inc. v. 3M Co.*,
   507 F.3d 442 (6th Cir. 2007) ......................................................................................... 13

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ......................................................................................... 17

*Otter Tail v. United States*,
   410 U.S. 366 (1973) ........................................................................................................ 17

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) ......................................................................................... 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ......................................................................................... 14

*Redmond v. Mo. W. State Coll.*,
    No. 84-6139-CIV-SJ, 1988 WL 142119 (W.D. Mo. Nov. 2, 1988) ....................................16

*Reed Elsevier, Inc. v. Muchnick*,
    130 S. Ct. 1237 (2010)..........................................................................................................17

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ...............................................................................................3

*Salyer Grain & Milling Co. v. Henson*,
    13 Cal. App. 3d 493 (1970) ....................................................................................................7

*Sambreel Holdings LLC v. Facebook, Inc.*,
    No. 12cv668-CAB (S.D. Cal. Nov. 29, 2012) .............................................................11, 12, 17

*Sierra Diesel Injection Serv., Inc. v. Burroughs Corp, Inc.*,
    890 F.2d 108 (9th Cir. 1989) ..................................................................................................7

*Stearns v. Select Comfort Retail Corp.*,
    No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) .............................................15

*Sweeley v. Gordon*,
    47 Cal. App. 2d 385 (1941) .................................................................................................7, 9

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .........................................................................................14, 15

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ............................................................................................17

*United States v. Colgate and Co.*,
    250 U.S. 300 (1919)...............................................................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..........................................................................................................14, 17

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004).......................................................................................................11, 16, 17

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...................................................................................2, 9, 10

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ..............................................................................10

Cal. Code Civ. Proc. § 1856, subdiv. (a) ...................................................................................6

**Other Authorities**

Visually Create, powered by PeopleBrowsr API, launches at SXSW, by Shawn Roberts on
    March 12, 2012 ....................................................................................................................16

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................ *passim*

DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' COMPLAINT / CASE NO. 4:12-CV-06120-EMC

Fed. R. Civ. P. 12(b)(6)...............................................................................................................................i

DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' COMPLAINT / CASE NO. 4:12-CV-06120-EMC

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Twitter's free of charge internet platform, founded in 2006, now connects more than 140 million users who collectively post an average of more than 340 million "Tweets" per day.  In mid-2010, Twitter and PeopleBrowsr signed a contract that gave PeopleBrowsr a streaming data feed of all of the public Tweets posted daily by Twitter users, enabling PeopleBrowsr to offer various forms of analytic analysis to its customers.  That full feed, currently provided to select partners, is known colloquially as the "Firehose."  The July 2010 PeopleBrowsr contract was for one year, and either party could terminate for any reason with thirty days' notice.  Now that one-year term is long over, and after more than an additional year of month-to-month extensions as provided in the contract, Twitter has exercised its express right to terminate.  Twitter's termination reflects its transition to a business model wherein companies like PeopleBrowsr contract with one of a few Twitter partners that provide tailored access to Twitter's data, rather than receiving all data and directly from Twitter.  But PeopleBrowsr refuses to change along with the evolving platform.  Instead, it asks this Court to force Twitter to keep doing business with PeopleBrowsr on whatever terms PeopleBrowsr sees fit for as long as PeopleBrowsr sees fit.  There is no basis for such relief.

PeopleBrowsr asks the Court to bar Twitter from making basic business decisions about whether to continue a business relationship with an inflexible and undesirable partner.  Holding Twitter hostage to PeopleBrowsr's business plan runs counter to the caselaw analyzing claims that effectively limit the ability of firms to develop and control the future of their own platforms.  That caselaw makes it abundantly clear that PeopleBrowsr has stated no claim, and its Complaint should thus be dismissed.  The relief sought by PeopleBrowsr would put the growth and vitality of Twitter – and indeed of other similarly situated internet platform entities – directly at stake, by eliminating their right to restructure their evolving businesses and choose their partnerships as they grow.  It also would put the Court in the position of arbiter of every contractual term the parties previously agreed to, as well as craftsman of the terms of a renewed contract.

PeopleBrowsr's Complaint tries four different routes around Twitter's straightforward right to terminate the contract at issue.  All are dead ends, and all should be dismissed.  *First*, PeopleBrowsr

claims that promissory estoppel bars Twitter from terminating the contract because of vague references made about the future direction of the platform. Even if Twitter's statements related to PeopleBrowsr's contract for the Firehose—which they did not—this claim fails because it is directly contrary to the parties' written agreement, which was integrated, and could not be modified except by another written agreement. The law is clear that PeopleBrowsr cannot bring in extraneous alleged representations in hopes of modifying an integrated agreement. *Second*, PeopleBrowsr claims that Twitter cannot terminate because to do so would interfere with current and future PeopleBrowsr's contracts with third parties. Again, that argument is contrary to the parties' written agreement, which gives Twitter the right to terminate. Twitter cannot be liable for exercising a right that PeopleBrowsr bargained for and agreed to. To the contrary, it is well-established that Twitter's decision is legally privileged: as a matter of law the exercise of an express contractual right cannot constitute a tort. *Third*, PeopleBrowsr alleges that Twitter violated the "unlawful" prong of Section 17200 of the California Business and Professions Code by interfering with PeopleBrowsr's contracts by terminating the 2010 agreement, on the theory that exercising that right constitutes an unlawful act. But the caselaw is clear: exercising a contractual termination right cannot constitute interference with contract, and thus cannot form the basis of a Section 17200 "unlawful act" claim. And *fourth*, PeopleBrowsr also alleges that Twitter has violated the "unfair" prong of Section 17200 by engaging in anticompetitive behavior. That claim is contrary to the basic principles of antitrust law: it fails to allege any cognizable antitrust injury, attempts a flawed market definition that consists of nothing more than a subset of Twitter's own product line, and alleges no anticompetitive behavior. PeopleBrowsr would have the Court take over control of the distribution and pricing of Twitter's product, even though PeopleBrowsr cannot establish any of the elements of an antitrust claim.

In sum, PeopleBrowsr is relying on four flawed arguments in hopes of forcing Twitter into a never-ending relationship that neither party bargained for and that would restrict the Twitter's ability to operate as an independent business. The Court should reject that effort and grant this motion to dismiss.

## II.   FACTUAL SUMMARY

### A.   The Parties Negotiated A Contract That Gave Both Parties The Right To Terminate Without Cause.

In June 2010, PeopleBrowsr entered into a one-year contract with Twitter, under which Twitter provided PeopleBrowsr with an application programming interface ("API") that gave PeopleBrowsr a streaming data feed of all of the public Tweets posted daily by Twitter users, referred to as the "Firehose."  Req. Judicial Notice filed herewith ("RJN") Ex. A ("the Agreement").[1]  The Agreement had an effective date of July 1, 2010, and the one-year term of the contract thus expired more than 16 months ago.  At that point, the contract converted to a month-to-month deal.

Twitter's right to terminate the Agreement at any time with thirty days' notice is unambiguous. Section 5.2 of the Agreement provides that "*Either party may terminate this Agreement without cause with thirty (30) days prior written notice.*"  *Id.* § 5.2 (emphasis added).  The Agreement also expressly bars *any* liability for exercising that termination provision:  Section 5.3 further states that *"[n]either party will be liable to the other for any damages resulting solely from termination of this Agreement as permitted for under this Agreement."*  (Emphasis added).

In addition to the one-year term and termination provisions, the Agreement is integrated (*Id.* § 11):

> This Agreement constitutes the entire agreement among the parties with respect to the subject matter and supersedes and merges all prior proposals, understandings and contemporaneous communications.  Any modification to this Agreement must be in a writing duly authorized by Twitter or pursuant to Section 2.1 (Updates). . . . No waiver by Twitter of any covenant or right under this Agreement will be effective unless memorialized in a writing duly authorized by Twitter.

Finally, the Agreement provides for the following additional limitations on liability in Section 9.1:

---

[1]  The Agreement is expressly referenced in the Complaint, and its terms are essential to determining this motion.  Accordingly, it is properly before the Court on a Rule 12 motion.  *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1199 (9th Cir. 2010).  The Complaint also references a July 2008 Content License Agreement, although the actual terms of that document bear little if any resemblance to the Complaint's description.  Both documents are submitted herewith as Exhibits A and B respectively to Twitter's Request for Judicial Notice, and have previously been filed by PeopleBrowsr in support of its pre-removal state court motion practice.

In no event will either company be liable to the other for any special, incidental, exemplary, punitive, or consequential damages (including loss of use, data, business or profits) arising out of or in connection with this Agreement, whether such liability arises from any claim based upon contract, warranty, tort (including negligence), strict liability or otherwise, and whether or not the party has been advised of the possibility of such loss or damage.  The foregoing limitations will survive and apply even if any limited remedy specified in the Agreement is found to have failed of its essential purpose.  In any case, Twitter's aggregate liability under this Agreement will not exceed the Fee that Company paid Twitter for use of the Licensed Material.

**B.     Twitter Decided Not To Renew The Agreement**

Twitter has grown quickly since 2010, developing new business models and new partners.  As part of its evolving business model, Twitter decided not to continue to renew most of its direct-to-user Firehose contracts, instead limiting them to those partners who had successfully demonstrated strategically beneficial uses and business models. Compl. ¶¶ 98-118.  Instead, Twitter created a structure wherein three resyndication partners (Gnip, DataSift, and Topsy) serve as intermediaries, reselling Twitter data in various forms to customers.  *Id.* ¶ 114.

After the one-year term of the PeopleBrowsr Agreement ran, Twitter repeatedly explained the Firehose transition to PeopleBrowsr, in multiple discussions during which the parties' contract continued on a month-to-month basis, per its terms.  RJN Ex. A § 5.1; Compl. ¶¶ 98-118.  Finally, on July 26, 2012, in an email directed to Jodee Rich at PeopleBrowsr, Twitter gave formal notice that it would terminate the Agreement.  Compl. ¶ 119.  Twitter voluntarily extended the notice period to 90 days (to October 25, 2012) to allow PeopleBrowsr time to transition to data provided through Twitter's resyndication partners. The July 26th email again explained the transition:

> We would like to begin the process to transition PeopleBrowsr to our standard for elevated data access.  As explained to you many times over the past year, we are no longer in a position to continue to support PeopleBrowsr's current month-to-month Firehose license. . . .
> Over the past year and a half, Twitter has publicly moved away from direct legacy Firehose licenses and created channel resyndication partnerships with Gnip and DataSift to address broad commercial demand in a consistent and transparent manner.  Our partners at Gnip and DataSift offer products with a licensing model tailored to a wide array of reasonable use cases.  For example, PeopleBrowsr's peers with industry-leading products that compete directly with Kred and Playground license Twitter data through this tier.[2]

---

[2] RJN Ex. C.

1   PeopleBrowsr made no secret of its desire for a new deal, but refused to accept the available data

2   access provided through Twitter's resyndication partners.  Unlike its competitors, PeopleBrowsr has

3   repeatedly demanded that it be allowed to continue to receive (1) the identical product (albeit at a vastly

4   larger scale than in 2010) at (2) the exact 2010 terms, apparently forever.  Twitter no longer offers the

5   product and pricing structure that it offered in 2010.  Flexibility, particularly for a new and rapidly

6   evolving company in an equally new arena, is what negotiated contracts are designed to protect:  there

7   was a one-year term and a termination provision in the parties' negotiated agreement for a reason.  But

8   now PeopleBrowsr asks the courts to ignore those terms and compel Twitter to continue do business with

9   it indefinitely—not on the terms Twitter offers to PeopleBrowsr and its competitors, but rather on

10  whatever terms PeopleBrowsr demands.

11  **III.    ARGUMENT**

12  PeopleBrowsr purports to state five causes of action:  promissory estoppel, interference with

13  contract, interference with prospective business advantage, and violations of California Business &

14  Professions Code Section 17200 by both allegedly unlawful conduct (interference with contract) and

15  allegedly unfair conduct (monopolization of a "Twitter Big Data Analytics Market").  None of those

16  claims survives Rule 12 scrutiny.

17  **A.    PeopleBrowsr's Promissory Estoppel Claim Is Barred By The Parties' Written
         Contract**

18

19          **1.    There Is a Written, Integrated Contract Between the Parties**

20  PeopleBrowsr's Complaint tries to convey an impression that the contract between Twitter and

21  PeopleBrowsr is the product of a years-long set of public and private assertions that, taken together,

22  constitute a "promise" that Twitter is "estopped" from breaking.  To that end, it is not until Paragraph 45

23  that PeopleBrowsr even *mentions* the existence of the *written* contract between the parties, and

24  PeopleBrowsr mentions it only once more (at Paragraph 48 of its 46-page, 161-paragraph Complaint).

25  That express, integrated arm's-lengths contract, between sophisticated corporations, is fatal to

26  PeopleBrowsr's claims.

27

28

### 2.    The Written Contract Bars PeopleBrowsr's Claims of Contrary "Promises"

PeopleBrowsr attempts an end run around the clear terms of its written Agreement by asserting a range of general (and often contrary) statements and supposed "promises" about the possible future direction of Twitter's platform as a whole.  Compl. ¶¶ 27-36.  Those statements cannot bear the weight PeopleBrowsr seeks to place on them.  They fall far short of what PeopleBrowsr now claims:  that Twitter promised to provide all of Twitter's data to PeopleBrowsr in whatever form PeopleBrowsr demands, forever, regardless of either changes in its business or the express terms of the actual Agreement.  But this Court need not assess those factual issues, as the Agreement is integrated, and thus the attempt to rely on pre-Agreement representations is flatly barred by the parol evidence rule.

The parol evidence rule bars the introduction of extrinsic evidence which contradicts the express language of a contract.  *BMW of N. Am., Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 990 (1984); *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 277 (9th Cir. 1992) (under California law if "language of the contract is not reasonably susceptible of [the proffered] interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.") (quotation omitted); *Enrico Farms, Inc. v. H.J. Heinz Co.*, 629 F.2d 1304, 1306 (9th Cir. 1980) (holding that extrinsic evidence must "not contradict the terms of the writing.") (quotation omitted).  The rule, embodied in California Code of Civil Procedure Section 1856, provides that where the parties to a contract have reduced the terms of their agreement to a writing which they intend as the final and complete expression of their understanding, the contract it is deemed integrated and may not be contradicted or modified by evidence of any prior agreement or of a contemporaneous oral agreement.  Cal. Code Civ. Proc. § 1856, subdiv. (a); *Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968); *Banco Do Brasil, S.A. v. Latian, Inc*., 234 Cal. App. 3d 973, 1000 (1991); *Altera v. Clear Logic, Inc.,* 424 F.3d 1079, 1091 (2005) (under California law parties "may not introduce evidence of terms not specifically included in the contract or evidence that contradicts the terms of the contract.").  The rule is not merely evidentiary, meant to exclude precontractual discussions for lack of credibility or reliability.  Rather, it is a rule of substantive law making the parties' integrated written agreement their exclusive and binding contract no matter how persuasive the evidence of additional, or different, oral understandings.  Evidence

of such understandings is legally irrelevant and cannot support a judgment. *Banco Do Brasil*, 234 Cal. App. 3d at 1000.

The purpose of the parol evidence rule is to protect the parties' statement of intent, as expressed in their written contract, and allow them to rely on the legal certainty of that expression so it is not "rendered meaningless by the oral revisionist claims of a party who, at the end of the game, does not care for the result." *Id.* at 1011. This is especially true where, as here, the parties are experienced business professionals who have negotiated an arm's length deal. *Salyer Grain & Milling Co. v. Henson*, 13 Cal. App. 3d 493, 501 (1970); *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp, Inc.*, 890 F.2d 108, 112 (9th Cir. 1989) (sophistication of parties relevant to parol evidence determination).

The Agreement between PeopleBrowsr and Twitter is an integrated contract between sophisticated corporations. PeopleBrowsr cannot erase its express terms by alleging contrary representations beyond its four corners. And PeopleBrowsr alleges no breach of the actual contract: there is no claim that Twitter has failed to perform any term of the Agreement, or even that Twitter threatens to breach any term of that agreement, much less that PeopleBrowsr has suffered damages as a result. *See, e.g.*, *Bridge v. E*Trade Sec. LLC*, No. C-11-2521 EMC, 2011 WL 5444266, at *10 (N.D. Cal. Nov. 9, 2011) (reciting the elements for a contract claim). Rather, PeopleBrowsr asks the Court to *enjoin* Twitter from exercising a right expressly bargained for and included in that contract: the right to terminate. This states no contract claim.

**B.**     **PeopleBrowsr's Interference Claims Are Barred By Privilege**

PeopleBrowsr's other attempt to plead around the Agreement, by recasting its claims as "interference with contract," also fails. The interference claims are fundamentally at odds with the termination provision in the Agreement. Where a party has a bargained-for right to terminate, the exercise of that right is privileged (sometimes referred to as "justified"), and cannot give rise to a tort claim. *See*, *e.g.*, *Sweeley v. Gordon*, 47 Cal. App. 2d 385 (1941) (sustaining demurrer to interference claim based on contractual right); *Freed v. Manchester Serv., Inc.*, 165 Cal. App. 2d 186, 190 (1958) (privilege bars inducing breach of contract claim); *Mayes v. Sturdy N. Sales*, 91 Cal. App. 3d 69, 80 (1979), *overruled on other grounds Brutto v. Chin*, No. B194350, 2008 WL 2191772 (May 28, 2008)

(same).  Twitter's bargained-for termination right under the Agreement bars a tort claim based on the exercise of that right.

Even without Twitter's unquestionable privilege to terminate the Agreement by its plain language, PeopleBrowsr's interference claim also fails as a matter of law and common sense. PeopleBrowsr blames Twitter for its inability to deliver on the primary contract it alleges, between itself and the Department of Defense (or perhaps Strategic Technology Research).  But by PeopleBrowsr's own admission, it did not enter into that contract until *after* the term of the Twitter Agreement had run, and PeopleBrowsr and Twitter were actively and unsuccessfully negotiating a possible new contract. Compl. ¶ 104 (PeopleBrowsr tells Twitter of its "candidacy" for Department of Defense contract in October 2011, after Agreement had expired).  If PeopleBrowsr chose to promise a customer it would have uninterrupted "Firehose" access for the next three years, while fully aware that Twitter was not inclined to renew its contract (*id.* ¶¶ 104-07), that was PeopleBrowsr's choice.  But that choice cannot be used to force Twitter into a business relationship to which it has not agreed.  As for PeopleBrowsr's description of the terms and timing of its other allegedly interfered-with contracts, the Complaint is too cryptic to address.  Specifically, it fails to identify when those contracts were formed, what they promise, or why they cannot be performed using the Twitter data plans currently available to PeopleBrowsr. Indeed PeopleBrowsr fails even to identify which of the two plaintiff Peoplebrowsr entities is the contracting party, and thus which of them purports to state the claims.  And again, if PeopleBrowsr in fact promised these third parties it would have continued full Firehose access beyond the term of its existing Twitter contract, it cannot lay that choice at Twitter's feet.

PeopleBrowsr also futilely adds an interference with prospective economic relations claim.  That too fails, both for the same reasons as the interference with contract claim and because interference with prospective advantage requires an independently wrongful act.  In *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995), the California Supreme Court held that to make a claim for interference with prospective contractual or economic relations, a plaintiff "must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Id.* at 393; *see also Chaganti v. I2 Phone Int'l, Inc.*, 313 F. App'x 54, 56-7 (9th Cir. 2009) (sustaining

Rule 12 dismissal based on failure to plead independently wrongful act).  Here, the first allegedly wrongful independent act is Twitter's breaching its alleged promise to "maintain an open ecosystem." Compl. ¶ 44.  But as explained above, PeopleBrowsr's promissory estoppels claim hinges on evidence that is contrary to the parties' integrated agreement, and, therefore, barred by the parol evidence rule. The second allegedly wrongful act is violation of Section 17200.  *Id.* ¶ 140.  As explained below, the 17200 claim also fails.  PeopleBrowsr has not come close to pleading any violation, real or potential, of antitrust laws or the spirit of those laws.

### C.       PeopleBrowsr's Section 17200 Claims Fail

PeopleBrowsr's Section 17200 claim is in fact two separate claims under two separate prongs of Section 17200:  that Twitter's termination of the Agreement is an "unlawful" act, and that Twitter's alleged anticompetitive conduct is an "unfair" act.  Neither allegation is sufficient to sustain a claim.  The first, that Twitter "committed unlawful acts" through "intentional interference with PeopleBrowsr's existing contracts and prospective business relations," (Compl. ¶ 154), is squarely foreclosed by controlling precedent.  As a matter of law, Twitter is privileged to exercise its termination right, and that exercise thus cannot be unlawful.  As we explain above in Section III.B., where a party has a bargained-for right to terminate, the exercise of that right is privileged (sometimes referred to as "justified"), and cannot give rise to a tort claim.  *See*, *e.g.*, *Sweeley*, 47 Cal. App. 2d at 385.

Recognizing that as a matter of law a privileged act cannot support a Section 17200 claim, PeopleBrowsr also attempts to plead an antitrust claim under the "unfair acts" prong of Section 17200. In that claim, PeopleBrowsr alleges that Twitter "commit[ted] acts of unfair competition that significantly threaten or harm competition."  Compl. ¶ 155.  For the reasons set forth below, this "unfair act" claim fails as well.

### 1.       Legal Standard

"Unfair competition" is defined under Section 17200 as encompassing five types of conduct: (1) an "unlawful" business act; (2) an "unfair" business act; (3) a "fraudulent" business act; (4) "unfair,

deceive, untrue or misleading advertising"; and (5) any act prohibited by Sections 17500-17577.6.[3] The Complaint makes no claims about "fraudulent" business acts, "unfair deceptive, untrue or misleading advertising," or any act proscribed by Section 17500 *et seq.* For purposes of this Motion, the relevant inquiry is whether Plaintiffs sufficiently alleged an "unlawful" or "unfair" business act. *See* Compl. ¶¶ 154 & 155 (referencing "*unlawful*" acts and "acts of *unfair* competition") (emphasis added). In the context of this case, the only "unlawful" or "unfair" business acts asserted involve antitrust claims—claims that fail for the reasons set forth below.

*Unlawful Business Act.* Put simply, a business act is "unlawful" if it violates some other law. Section 17200 borrows violations of other laws and treats them as "unlawful" practices that the UCL makes independently actionable. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). To plead a Section 17200 claim based on an "unlawful" business act, a plaintiff must allege facts sufficient to show a violation of some underlying law. *See Churchill Vill., L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1132 (N.D. Cal. 2000) (holding that defendant's compliance with underlying federal law precluded liability under Section 17200); *Aquino v. Credit Control Servs.*, 4 F. Supp. 2d 927, 930 (N.D. Cal. 1998) (dismissing Section 17200 claim where plaintiff failed to "set forth any factual allegations that the defendant's approach violated any state or federal provisions.").

*Unfair Business Act.* Although the statute does not define an "unfair" business act, "[c]ourts may not simply impose their own notions of the day as to what is fair or unfair." *Cel-Tech Commc'ns*, 20 Cal. 4th at 182. Rather, the word "unfair" in Section 17200 "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition" (*id.* at 187) and "requir[es] that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition") (*id.* at 186-87).

---

[3] The full text of Section 17200 reads as follows: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

1     Conduct alleged to be "unfair" because it unreasonably restrains competition and harms

2 consumers is not, in fact, "unfair" if the conduct is deemed reasonable and condoned under the antitrust

3 laws. This is because "[t]he purpose of the federal and state antitrust laws is to protect and promote

4 competition for the benefit of consumers[,]" such that a court's "determination that the conduct is not an

5 unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers. To

6 permit a separate inquiry into essentially the same question under the [California] unfair competition law

7 would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct."

8 *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) (sustaining demurrer).

9         **2.**     **Twitter Has the Right to Control Its Data**

10     PeopleBrowsr's allegations as to both "unlawful" and "unfair" competition fail to state a claim

11 under Rule 12. PeopleBrowsr's complaint asks the Court to prevent Twitter from controlling its own

12 ability to contract for access to its own Firehose. If ever allowed, claims like those asserted here would

13 destroy the incentives of companies to innovate and compete, fearing that they will have to share their

14 property with every free rider that comes along.

15     For precisely this reason, PeopleBrowsr's claims also run contrary to the caselaw analyzing

16 claims that effectively limit the ability of firms to develop and control the future of their own platforms.

17 As an example, a recent decision from the Southern District of California grappled with similar issues,

18 though involving a different social networking platform, Facebook. In *Sambreel Holdings LLC v.*

19 *Facebook, Inc.*, the plaintiff alleged that Facebook attempted to eliminate competition in the sale of

20 online display advertising on Facebook's own website. *See* Order Den. Mot. Prelim. Inj. Granting Mot.

21 Dismiss, *Sambreel Holdings LLC v. Facebook, Inc.*, No. 12cv668-CAB (S.D. Cal. Nov. 29, 2012), ECF

22 No. 58. The court was not persuaded by the plaintiff's complaint, concluding instead that:

23       As an overarching premise, the Court is persuaded that Facebook has a right to control its
24       own product, and to establish the terms with which its users, application developers, and
      advertisers must comply in order to utilize this product. Indeed, it is well settled that, "as
25       a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader
      or manufacturer engaged in an entirely private business, freely to exercise his own
26       independent discretion as to parties with whom he will deal.'"

27 Slip Op. at 5 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408

28 (2004) (quoting *United States v. Colgate and Co.*, 250 U.S. 300, 307 (1919))).

The *Sambreel* court underscored that Facebook "has surely invested a significant amount of resources to develop its business, as Plaintiff recognizes in the Complaint[.]" *Id.* The court held "that Facebook has a right to protect the infrastructure it has developed, and the manner in which its website will be viewed." *Id.* Only "[w]ithin this framework the Court will consider whether the Complaint nevertheless alleges that Facebook has violated the antitrust laws." *Id.* at 5-6. Consistent with *Sambreel*, two other recent cases addressing social media reach similar conclusions. *See, e.g.*, *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (finding no harm to competition when defendant social network MySpace chose to remove links to a competitor's website); *Facebook, Inc. v. Power Ventures, Inc.*, Case No. C 08-05780 JW, 2010 WL 3291750, at *14 (N.D. Cal. July 20, 2010) (holding that Facebook may prohibit the display of unauthorized advertisements to its users because "[i]f Facebook has the right to manage access to and use of its website, then there can be nothing about anticompetitive about taking [] action to enforce that right.").

The same must be true for Twitter, which has, as Plaintiffs acknowledge, since just 2006, grown into a service that is free of charge and open to anyone, connecting over 140 million users that collectively post an average of more than 340 million Tweets per day. Compl. ¶ 3. Twitter must be permitted to develop and control the future of its own platform relationships, or the growth and vitality of this aspect of Twitter's business is put directly at stake. The caselaw makes it abundantly clear that PeopleBrowsr's 17200 claim should be dismissed accordingly.

### 3. Plaintiffs Allege No Unlawful or Unfair Act Under the Cartwright Act

PeopleBrowsr's Complaint focuses exclusively on the actions of Twitter—and Twitter alone—with no claims of any combined, joint, or conspiratorial action. Indeed, the Complaint is premised on Twitter's "ha[ving] *exclusive control* over its data." Compl. ¶ 155; *see also id.* ¶ 157 ("Twitter is using its *exclusive control* over its data to gain control of the Twitter Big Data Analytics market. . . . Twitter has used its *exclusive control* over its data to extract valuable and sensitive business information") (emphasis added). There are no allegations of a combination or conspiracy with anyone to terminate PeopleBrowsr's Firehose access.

Such unilateral activity is not actionable under California's Cartwright Act, which applies only to joint conduct. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986), *modified*, 810

1   F.2d 1517 (9th Cir. 1987) (dismissing monopolization and attempted monopolization claims because

2   "arguments challeng[ing] only unilateral conduct . . . . is not cognizable under the Cartwright Act, for it

3   fails to allege any combination.").  PeopleBrowsr's allegations therefore rise or fall under the one statute

4   that *does* apply to unilateral conduct, Section 2 of the federal Sherman Act.

5       **4.    Plaintiffs Allege No Unlawful or Unfair Act Under the Sherman Act**

6           Because PeopleBrowsr's Complaint fails to allege any facts that would support a Cartwright Act

7   claim, its claim that Twitter is engaged in anticompetitive conduct must be based on the Sherman Act.

8   But PeopleBrowsr fails to state a Section 2 claim for three separate reasons:  (1) lack of antitrust injury;

9   (2) lack of a plausible relevant market; and (3) lack of anticompetitive conduct.  Each is an essential

10  element of PeopleBrowsr's claim, and the insufficiency of the allegations on any one warrants dismissal

11  of the claim under Rule 12.

12      **a.    Plaintiffs Have Not Alleged Cognizable Antitrust Injury**

13          Plaintiffs cannot demonstrate "antitrust injury."  An injury is cognizable under the antitrust laws

14  only if the injury is "of the type the antitrust laws were intended to prevent and that flows from that

15  which makes the defendant's acts unlawful."  *See Atl. Richfield Co. v. USA Petroleum, Co.*, 495 U.S.

16  328, 334 (1990) (quotation omitted); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489

17  (1977).  "[T]he [plaintiff's] loss must stem from a competition-reducing aspect or effect of the

18  defendant's behavior."  *Atl. Richfield*, 495 U.S. at 344 (citation omitted).  Otherwise, it is not an antitrust

19  injury.

20          The fatal problem here is that PeopleBrowsr is suing to protect its *own monopoly*.  The Complaint

21  alleges that, by reducing its Firehose access, Twitter is endangering PeopleBrowsr's status as the *only*

22  full-service supplier of "Twitter Big Data Analytics."  *See* Compl. ¶ 157; *id.* ¶¶ 126, 159 (noting that

23  "PeopleBrowsr is one of two viable providers of Influence Measurement.  It is the sole provider of

24  Action Analytics for Government and Enterprise.").  Protection of a plaintiff's dominant position,

25  however, is not the business of antitrust.  *See Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007)

26  (en banc) (dismissing complaint because the protection of plaintiff's previously-dominant position was

27  not compensable antitrust injury; "NicSand has not sued 3M because it wants to share shelf space with its

28  competitor; it sued 3M because it wants that shelf space all to itself[.]").

1    Here, moreover, PeopleBrowsr would incur the identical injury—but no compensable harm—if

2    Twitter simply left the business or if Twitter decided to provide a new firm with the identical level of

3    Firehose access.  Such actions would similarly "cut off PeopleBrowsr's Firehose access, limiting

4    PeopleBrowsr's data access to a fraction of its current volume."  Compl. ¶ 157.  Its injuries, therefore, are

5    not compensable antitrust injuries under the law.  *See Brunswick*, 429 U.S. at 487 (no antitrust injury

6    where plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired

7    centers instead obtained refinancing or been purchased by 'shallow pocket' parents"); *see also Bayou*

8    *Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) ("Bayou's failure to acquire the

9    Wilcox franchise does not constitute an antitrust injury.  Bayou would have suffered the identical loss of

10   sales, and economies of scale if Wilcox had retained his operation or if he had sold to a third party.").

11                 **b.      Plaintiffs' Market Definition Is Not Plausible**

12   "As a threshold issue in any monopolization claim, the court must identify the relevant market."

13   *IGT v. Alliance Gaming Corp., et al.*, --- F.3d ----, 2012 WL 6554712, at *4 (Fed. Cir. Dec. 17, 2012)

14   (citing *M.A.P. Oil Co. v. Texaco, Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982) (footnote omitted)).[4]  A

15   product market is defined by products that, from a consumer's perspective, are reasonable substitutes or

16   are interchangeable for each other.  *See*, *e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th

17   Cir. 1995).  Plaintiffs allege that the affected market is the "Twitter Big Data Analytics market," i.e., the

18   use of Twitter's own Firehose data.  *See*, *e.g.*, Compl. ¶¶ 156, 160 (alleging that "PeopleBrowsr

19   participates in the 'Twitter Big Data Analytics Market,'" and that because of Twitter's acts of unfair

20   competition, "Twitter would gain greater market power in markets using Twitter data").  PeopleBrowsr's

21   market definition is not plausible.

22                 As a general matter, single-brand product markets, like a market for Twitter Big Data Analytics,

23   are presumptively invalid.  *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393

24   (1956) ("there are certain differences in the formulae for soft drinks but one can hardly say that each one

25   is an illegal monopoly."); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001) (rejecting

26

27   _____
     [4] As with any monopolization claim, two types of relevant markets must be identified:  geographic
28   market and product market.  *IGT*, 2012 WL 6554712, at *4 n.2 (citing *M.A.P. Oil*, 691 F.2d at 1306).
     Geographic market is not at issue in this case.

"restrict[ion of] the relevant market to a single athletic program in Los Angeles based solely on [plaintiff's] own preferences"); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (rejecting claim that Brighton products constitute own market and noting that "[t]here is no structural barrier to the interchangeability of Brighton products with goods produced by competing manufacturers"); *Elliott v. United Ctr.*, 126 F.3d 1003, 1004-06 (7th Cir. 1997) (affirming dismissal because single arena could not qualify as food sales product market); *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *13 (N.D. Cal. June 5, 2009) ("'company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product'") (quotations omitted); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1197-99 (N.D. Cal. 2008) (rejecting claim that Mac OS constitutes single-product market).[5]

Here, Plaintiffs seek to define a market that is even *smaller* than a single-brand market—the "Twitter Big Data Analytics market." The fact that PeopleBrowsr prefers using Twitter data based on the various characteristics it alleges does not mean the relevant antitrust market is limited to those data. The amount of data potentially available to PeopleBrowsr and other data analysis firms is vast, including other data providers like Google, Facebook, and others. By its own allegations, PeopleBrowsr makes clear that it is the only firm utilizing the Firehose data in each of the "Influence measurement," government analysis, and "Financial Data Services" end-use cases it identifies. Compl. ¶ 126. But a relevant market cannot be confined to the product of which the plaintiff is the only user. *Tanaka*, 252 F.3d at 1065. The fact that Plaintiffs made the decision to contract with Twitter and chose to rely on Firehose access, while many other sources of data are undoubtedly available and are regularly used by other data analysts, does not mean that Twitter's Firehose is a plausible antitrust market. Indeed, the case

---

[5] This case is unlike *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008), where the court concluded that "the law permits an antitrust claimant to restrict the relevant market to a single brand of product at issue[.]" *Id.* at 1048-49. The *Newcal* court explained that, notwithstanding the fact that in limited circumstances a single brand market could stand, those circumstances did not include a situation in which the plaintiff's own business decisions resulted in its reliance on a single brand. For example, if a widget manufacturer designs its widgets in such a way that they can be assembled using only a single brand of screws (notwithstanding the fact that many brands of screws are readily available), that manufacturer cannot later complain that the screw company raised its prices for its screws because it knew that the widget manufacturer had made the business decision to rely on that brand for assembly. PeopleBrowsr, by its own admission, has a "contractually created" relationship with Twitter (Compl. ¶¶ 44-48), and cannot now plausibly define a relevant product market based on its decision to self-select into its contract with Twitter.

law confirms precisely the opposite.  *See Power Ventures, Inc.*, 2010 WL 3291750, at *14 ("If Facebook has the right to manage access to and use of its website, then there can be nothing anticompetitive about taking [] action to enforce that right.").  In fact, the idea that Twitter's Firehose is the only source of data upon which PeopleBrowsr can reasonably rely is belied by PeopleBrowsr's own website where it explains the other sources of data it relies upon, including "public Facebook quotes, and over 40 million blogs and forums."[6]  *See Redmond v. Mo. W. State  Coll.*, No. 84-6139-CIV-SJ, 1988 WL 142119, at *2 (W.D. Mo. Nov. 2, 1988) ("[a]ntitrust plaintiffs cannot, however, artificially define a market so as to cover only the practice complained of").

### c.  Plaintiffs Cannot Demonstrate Any Anticompetitive Conduct

The premise of Plaintiffs' Complaint is that they have the right to complete and direct access to the Twitter Firehose for perpetuity, that Twitter has no role to play in choosing how or by whom its own Firehose data are used, and that Twitter should not improperly "provide full Firehose access" to other data analytics partners at the expense of PeopleBrowsr.  *See, e.g.*, Compl. ¶ 7 ("PeopleBrowsr has invested millions of dollars and years of work in building a business based on the Firehose.  It did so in reliance on Twitter's representations that it would maintain an 'open ecosystem' for the use of its data, in which PeopleBrowsr could freely compete without fear that Twitter would cut off access to its data in order to influence which business succeed or to usurp business opportunities for itself."); *id.* ¶ 124 (rejecting "suggested alternatives to Firehose," including indirect access through third parties); *see also id.* ¶ 93 (complaining that Twitter provided full Firehose access to "closely controlled data analytics partners, such as Socialflow, Crimsonhexagon, Sysomos, and Dataminr.").

Plaintiffs' demand for full, perpetual, and unfettered access to the Firehose is untenable and directly contrary to the Supreme Court's holding in *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, that "as a general matter, the Sherman Act 'does not restrict the long recognized right of

---

[6] "With instant access to over 1,000 days of Twitter metadata in 2008, Facebook posts and over 40 million blogs and forums, the PeopleBrowsr API instantly delivers incredibly social metadata to support any application."  *See* "Visually Create, powered by PeopleBrowsr API, launches at SXSW, by Shawn Roberts on March 12, 2012," available on the Peoplebrowsr website at http://blog.peoplebrowsr.com/2012/03/visually-create-powered-by-peoplebrowsr-api-launches-at-sxsw/ (last visited on Dec. 18, 2012).

1  [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent

2  discretion as to parties with whom he will deal.'"  540 U.S. at 408 (quotation omitted).  Twitter is under

3  no obligation to contract with PeopleBrowsr or offer any assistance to PeopleBrowsr, much less continue

4  its contractual relationship with PeopleBrowsr forever.  *Id.* at 410 ("[A]lleged insufficient assistance in

5  the provision of service to rivals is not a recognized antitrust claim"); *Christy Sports, LLC v. Deer Valley*

6  *Resort Co.*, 555 F.3d 1188, 1196 (10th Cir. 2009) ("If antitrust law permits a resort operator to organize

7  its business in either of two ways, by providing ancillary services itself or by allowing third parties to

8  provide the service on a competitive basis, we do not see why an initial decision to adopt one business

9  model would lock the resort into that approach and preclude adoption of the other at a later time."); *Data*

10  *Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1189 (1st Cir. 1994), *abrogated on other*

11  *grounds*, *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) (stating that consumers were not

12  harmed by manufacturer's refusal to sell to intermediate seller); *Olympia Equip. Leasing Co. v. W. Union*

13  *Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) ("If a monopolist does extend a helping hand, though not

14  required to do so, and later withdraws it as happened in this case, does he incur antitrust liability?  We

15  think not."); *Sambreel*, slip op. at 5 (holding that Facebook "has a right to control its own product, and to

16  establish the terms with which its users, application developers, and advertisers must comply in order to

17  utilize this product.").  As courts have held: "[A] company does not violate the Sherman Act by virtue of

18  the natural monopoly it holds over its own product."  *TV Commc'ns Network, Inc. v. Turner Network*

19  *Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (citing *E.I. duPont de Nemours & Co.*, 351 U.S. at

20  393). [7]

21      Because Twitter undoubtedly has the right under the antitrust laws to operate its business in the

22  way it chooses, to choose with whom it will deal (or will not deal), and to change its business model as

23

24  _____

[7] Any assertion that *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), counsels in favor of an opposite result is incorrect.  To begin with, in *Trinko*, the Supreme Court made clear that

25  "*Aspen Skiing* is at or near the outer boundary of § 2 liability," and creates only "limited exceptions" where a defendant has a duty to deal.  *Trinko*, 540 U.S. at 409.  Unlike the ski mountain in *Aspen* or the

26  single city-wide municipal power grid in *Otter Tail v. United States*, 410 U.S. 366 (1973), Twitter is a commercial business with a popular, but not essential, social media platform.  Moreover, the Supreme

27  Court made clear in *Aspen Skiing* that liability attached because the defendant, an essential facility, took actions that made no possible economic sense other than to exclude the plaintiff.  PeopleBrowsr makes

28  no similar allegations, because it cannot.

DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' COMPLAINT / CASE NO. 4:12-CV-06120-EMC

1    appropriate, its decision to limit PeopleBrowsr's access to the Firehose (or to grant it to others) simply

2    does not constitute anticompetitive conduct.  Competition can flourish just as easily with others as it can

3    with Plaintiffs.  Having failed to satisfy the necessary requirements to state a cause of action under state

4    or federal antitrust law, Count Four of Plaintiffs' Complaint must be dismissed for failure to state a

5    claim.

6    **IV.    CONCLUSION**

7           PeopleBrowsr, a sophisticated corporation, entered into a written integrated contract.  The term of

8    that contract has run, and Twitter has fully performed.  PeopleBrowsr wishes it had a longer contract, but

9    it doesn't.  PeopleBrowsr wishes Twitter would enter into a new contract with it, presumably at the

10   previous terms, but Twitter chooses to deal with others, and to deal with PeopleBrowsr through

11   intermediaries, as it has the unquestionable right to do.  The analysis ends there.  PeopleBrowsr's claims

12   fail on their face, and no amount of creative antitrust-in-17200's-clothing gymnastics can change that

13   fact.  The Complaint should be dismissed.

14   Dated:  December 27, 2012                          DURIE TANGRI LLP

15

16                                                      By:  _____*/s/ Michael H. Page*_____
                                                              MICHAEL H. PAGE
17                                                            JOSHUA H. LERNER

18                                                      WILSON SONSINI GOODRICH &
                                                            ROSATI, P.C.
19                                                      JONATHAN M. JACOBSON (*admitted to
                                                       N.D. Cal., but not CA state bar*)
20                                                     jjacobson@wsgr.com
                                                       1301 Avenue of the Americas, 40th Floor
21                                                     New York, NY 10019
                                                       Telephone:  212-497-7758
22                                                     Facsimile:  212-999-5899

23                                                     WILSON SONSINI GOODRICH &
                                                            ROSATI, P.C.
24                                                     SCOTT A. SHER (SBN 190053)
                                                       ssher@wsgr.com
25                                                     1700 K St., NW, Fifth Floor
                                                       Washington, DC 20006
26                                                     Telephone:  202-973-8822
                                                       Facsimile:  202-973-8899

27                                                     Attorneys for Defendant
                                                       Twitter, Inc.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I certify that all counsel of record is being served on December 27, 2012 with a copy of this document via the Court's CM/ECF system.

*/s/ Michael H. Page*
MICHAEL H. PAGE

DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' COMPLAINT / CASE NO. 4:12-CV-06120-EMC